Jacalyn **THORNTON**, Plaintiff–Appellant,

v.

**McCLATCHY NEWSPAPERS, INC.,** Defendant–Appellee.

No. 99–15857.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted Nov. 15, 2000

Filed Aug. 15, 2001

Walter W. Whelan (argued), Fresno, California, for the plaintiff-appellant.

Kathryn Morrison (argued) and Martha Michael Gates, Seyfarth, Shaw, Fairweather & Geraldson, Sacramento, California, for the defendant-appellee.

Before: KOZINSKI, HAWKINS and BERZON, Circuit Judges.

MICHAEL DALY HAWKINS, Circuit Judge:

Jacalyn Thornton, a former part-time reporter for The Fresno Bee (an unincorporated division of McClatchy Newspapers, Inc. ("McClatchy")), appeals the district court's grant of summary judgment in favor of McClatchy on Thornton's claims under the Americans with Disabilities Act ("ADA") and the California Fair Employment and Housing Act ("FEHA"). Thornton alleges that McClatchy failed to accommodate her workplace injury, which required prophylactic keyboarding and handwriting restrictions limiting the amount of time she engaged in such activities each day.

We conclude that the district court properly granted summary judgment for McClatchy on the ground that Thornton presented no genuine issue of material fact showing that she was disabled within the meaning of the ADA. We also affirm the district court's denial of Thornton's motion to amend her complaint. We vacate summary judgment on Thornton's FEHA claims and remand for reconsideration in light of a recent enactment by the California legislature.

### Facts and Procedural Background

Thornton began her career with The Fresno Bee in 1973. She worked in various positions until 1989, when she took a part-time position as a reporter in the Features Department. This job required that Thornton interview sources and write both short and in-depth stories. In fulfilling her duties, Thornton spent about a third of her time "keyboarding," that is, using the keyboard of her computer.

In 1994 and 1995, Thornton filed workers' compensation claims alleging injury to her neck for work-related repetitive stress disorder. In 1995, The Fresno Bee's doctor, Rhea Wong ("Dr. Wong"), restricted Thornton's work hours, and in 1996 another doctor reported that Thornton's injury was permanent and stationary. McClatchy made various accommodations for Thornton during this time period, including workstation adjustments, new chairs, modified work schedules, and a gym membership.

Thornton filed another workers' compensation claim in 1996, alleging injuries to her arm, shoulder and wrist. Thornton contended that doctors diagnosed this condition as myofascial pain syndrome which, in turn, caused thoracic outlet syndrome

symptoms. In February of 1997, Dr. Wong recommended that Thornton stop work completely and undergo intensive physical therapy. McClatchy granted Thornton an extended leave of absence.

In June of 1997, Dr. Wong released Thornton to return to work under the following restrictions: (1) continuous keyboard use limited to 30 minutes per day; (2) continuous handwriting limited to 5 minutes per day; (3) intermittent keyboard use limited to 60 minutes per day; and (4) intermittent handwriting limited to 60 minutes per day. Dr. Wong also concluded that, based on these restrictions, Thornton was not able to perform her job as a part-time features reporter.

Despite these restrictions on keyboarding and handwriting, Thornton was able to perform a wide range of daily tasks. On a July 25, 1997 Social Security disability application, Thornton stated that she continued to walk two miles each morning, prepare two to three meals a day for herself and her family, shop for groceries, and make beds. Thornton could drive with a pillow supporting her arm.

During June of 1997, The Fresno Bee considered various options for accommodating Thornton, including voice recognition technology and reassignment to different positions. However, it concluded that none of these options were viable, and that Thornton's physical conditions rendered her unable to perform the job of reporter.

On July 10, 1997, the Fresno Bee's Human Resources Department issued a "Personnel Action Request" to terminate Thornton as of August 16, 1997. Thornton then wrote a letter to the paper's executive editor, Keith Moyer, asking him to reconsider this decision. McClatchy contends that the Fresno Bee decided not to complete Thornton's termination, and that it still views her as on leave. Thornton contends that she was never informed of this decision. In the meantime, Thornton sought alternate employment, including teaching journalism at Fresno State.

Thornton filed this action on September 15, 1997, in Fresno County Superior Court. Thornton's complaint alleged that McClatchy violated the ADA and FEHA by terminating her on the basis of her disability. McClatchy removed the case to federal court on the basis of federal question jurisdiction. Thornton failed to make a timely request for a jury trial.

Thornton first moved to amend her complaint on June 22, 1998, seeking to add claims for defamation, wrongful termination in violation of public policy and retaliation. In addition, she sought to add three individual defendants. The magistrate judge denied this motion, finding that the proposed claims were futile and that the motion had been filed in bad faith. Specifically, he found "evidence of an improper purpose behind [Thornton's] desire to amend her complaint, namely, to attempt to regain her right to a jury trial on some cause of action."

Shortly thereafter, the California Supreme Court decided *City of Moorpark v. Superior Court*, 18 Cal.4th 1143, 77 Cal. Rptr.2d 445, 959 P.2d 752 (Cal.1998). *Moorpark* held that employees who were discriminated against on the basis of workplace injuries are not limited to workers' compensation remedies, but can also file FEHA and common-law wrongful discharge claims. On the basis of this decision, Thornton asked the district court to reconsider the magistrate's denial of her motion to amend. Thornton reasoned that *Moorpark* undermined the magistrate's findings of futility as to the wrongful termination in violation of public policy claim. The district court concluded that although the magistrate had improperly held that Thornton's wrongful termination claim was futile, there was "sufficient evidence in the record to support the ... finding that

[Thornton had] acted in bad faith in seeking to amend her Complaint for the purpose of 'undoing' her jury waiver."

Thornton then filed a second motion for leave to amend, seeking again to include a claim for wrongful termination in violation of California's public policy against injured worker discrimination. The magistrate denied this motion, finding that although Thornton's proposed amendment was not futile, it was nonetheless filed in bad faith and with undue delay, with resulting prejudice to the defendant. He reiterated, "The conclusion appears almost inescapable ... that the primary, if not sole, motive for plaintiff's motion to amend herein is to regain a trial by jury on at least some of her claims and/or to defeat defendant's already filed motion for summary judgment."

The district court affirmed the magistrate's decision in all respects, finding that Thornton's proffered reasons for delay were "nonsensical," and that there was a sufficient showing of prejudice to the defendant. Likewise, the district court found sufficient evidence to uphold the magistrate's finding of bad faith.

McClatchy then moved for summary judgment, arguing that Thornton could not show: (1) that she was disabled; (2) that she was a qualified individual with a disability; (3) that a reasonable accommodation existed; (4) a right to punitive damages under the ADA and FEHA; and (5) a right to compensatory damages under the ADA.

The district court granted the motion for summary judgment, concluding that Thornton was not disabled under either the ADA or FEHA and that, although Thornton had some moderate difficulties, they did not rise to the level of "substantial limitations" required by the ADA. Accordingly, the court did not reach any of the other issues raised in the summary judgment motion.

Thornton now appeals the grant of summary judgment as well as the denial of the motion for leave to amend her complaint.

## Analysis

### I. The Disability Claims

We review grants of summary judgment de novo. *Weiner v. San Diego County*, 210 F.3d 1025, 1028 (9th Cir.2000). Summary judgment is appropriate if there is no genuine issue of material fact. Fed. R.Civ.P. 56.

### A. Disability under the ADA

■ A plaintiff in an ADA case bears the burden of proving disability within the meaning of the ADA. *Thompson v. Holy Family Hosp.*, 121 F.3d 537, 539 (9th Cir. 1997). A "disabled" employee under the ADA is one who: (1) has a "physical or mental impairment that substantially limits one or more of the major life activities of such individual"; (2) has a "record of such an impairment"; or (3) is "regarded as having such an impairment." 42 U.S.C. § 12102(2). Thornton contends that she satisfies the first and third of these requirements.

#### 1. Substantial Limitation of Major Life Activities

■ On appeal, Thornton argues that she is substantially limited in the major life activities of "working" and "performing manual tasks." Whether a person is disabled under the ADA is an "individualized inquiry." *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999).

##### a. Working

■ Pursuant to EEOC regulations, "working" is a major life activity. To be substantially limited in "working," an individual must be

> significantly restricted in the ability to perform either a class of jobs or a broad

range of jobs in various classes as compared to the average person having comparable training, skills and abilities. The inability to perform a single, particular job does not constitute a substantial limitation in the major life activity of working.

29 C.F.R. § 1630.2(j)(3)(i). Courts should consider the geographical area to which the individual has reasonable access, and the "number and type of jobs utilizing similar training, knowledge, skills or abilities, within that geographical area, from which the individual is also disqualified." 29 C.F.R. § 1630.2(j)(3)(ii)(A), (B).[1] As the Supreme Court has explained, "If jobs utilizing an individual's skills (but perhaps not his or her unique talents) are available, one is not precluded from a substantial class of jobs." *Sutton,* 527 U.S. at 492, 119 S.Ct. 2139.

■ In this case, the district court concluded that "reporting does not constitute a sufficiently broad class of jobs to satisfy the substantial limitation requirement of the ADA." Moreover, Thornton had "not provided sufficiently specific, admissible evidence as to what jobs [required keyboarding and notetaking] or which she would be precluded from, among other matters."

■■ Under the law of our circuit, a plaintiff must present specific evidence about relevant labor markets to defeat summary judgment on a claim of substantial limitation of "working."[2] In *Thompson v. Holy Family Hosp.,* 121 F.3d 537

(9th Cir.1997), an employee brought suit under the ADA, contending that she was terminated from her position as a registered nurse on the basis of her disabling back and neck strain. The district court granted summary judgment on the ground that the plaintiff had failed to raise a genuine issue of material fact as to whether she was disabled. *Id.* at 539. We affirmed, noting that the plaintiff pointed to "no evidence that the restrictions on her ability to perform total patient care preclude her from engaging in an entire class of jobs." *Id.* at 540. Nor had she offered "the information relevant to this particularized determination." *Id.* We pointed out that our decision was in accord with that of other circuits and concluded that "Thompson's conclusory allegations are insufficient to withstand the motion for summary judgment." *Id.*

We reached a similar result in *Broussard v. Univ. of Cal.,* 192 F.3d 1252 (9th Cir.1999). In *Broussard,* the plaintiff alleged that her carpal tunnel syndrome substantially limited her major life activity of working. She presented an affidavit from a vocational rehabilitation specialist, who determined that she was limited to working in the sedentary to light category of jobs. The district court granted summary judgment in favor of the defendant. We again affirmed, concluding that the affidavit was not competent evidence to demonstrate a genuine issue of material fact. *Id.* at 1258. To defeat a motion for summary judgment, we held, the plaintiff "needed to identify what requirements

---

1. In *Sutton,* the Supreme Court suggested that the EEOC's inclusion of "working" as a major life activity was circular. However, for purposes of that case, the Court assumed, without deciding, that working is a major life activity. 527 U.S. at 492, 119 S.Ct. 2139. In this case, McClatchy does not deny that working is a major life activity. Accordingly, we also assume without deciding that working is a major life activity.

2. We reject Thornton's request to "take judicial notice that the severe restrictions on keyboarding and handwriting ... would substantially impair any person from working at a variety of clerical jobs." We conclude that judicial notice would be inappropriate since it would undermine circuit law on an ADA plaintiff's evidentiary responsibilities.

posed by the class of ... jobs ... were problematic in light of the limitations ... imposed on her." *Id.* at 1259 (*quoting Davidson v. Midelfort Clinic, Ltd.,* 133 F.3d 499, 507 (7th Cir.1998)) (internal quotation marks omitted).[3]

These decisions control the present dispute over Thornton's limitations as to "working." McClatchy presented evidence of Thornton's level of education, her acceptance into the teaching pool at Fresno State, and her work as a freelance journalist during this litigation, which all suggest that she is not substantially limited in the major life activity of working. Thornton, however, failed to present evidence of the jobs from which she was precluded and of the relevant labor markets for that class of jobs. Because Thornton presented no evidence on these issues, the district court properly concluded that she had failed to present a triable issue of material fact.

■ Thornton argues that our decision in *Wellington v. Lyon County Sch. Dist.,* 187 F.3d 1150 (9th Cir.1999), relieves her of the burden of coming forward with such evidence. In *Wellington,* a school janitor who developed carpal tunnel syndrome presented evidence that his education was limited to a high school degree, and that his work experience was limited to manufacturing, construction, heavy maintenance, and plumbing. *Id.* at 1155. He also presented medical evidence that he was permanently unable to perform work involving "metal fabrication, welding, ... heavy activities, carpentry, ... the use of a variety of tools to do maintenance and repairs." *Id.* (alteration in original).

We reversed the district court's grant of summary judgment, holding that "[t]hese facts suggest that Wellington may be precluded from working in any capacity in-

volving construction, maintenance or even light plumbing. Considering Wellington's 'training, skills and abilities,' there exist[ed] a question of fact as to whether he is 'significantly restricted in the ability to perform work in a class of jobs.'" *Id.*

*Wellington* also stated that "[n]o expert or other evidence has been presented to suggest that there are jobs available in the labor market for which a person having comparable training, skills and ability to Wellington would be qualified." *Id.* (internal quotation marks omitted). However, we did not say that the plaintiff was relieved from presenting evidence about jobs in the relevant labor markets. We merely noted that the defendant had not done so. *Wellington* involved unrebutted medical evidence about the various types of jobs from which the plaintiff was permanently restricted. Here there was no such evidence of restriction, and, unlike the defendant in *Wellington,* McClatchy presented evidence that Thornton was capable of securing other jobs.

Summary judgment for McClatchy on the substantial limitation on working claim was therefore appropriate.

#### b. Manual Tasks

■ Thornton also contends that she is "substantially limited" in the major life activity of "manual tasks." The district court noted that Thornton could perform "a broad range of manual tasks, including cooking, caring for herself, grocery shopping and light housework." As such, her inability "to perform a narrow range of activities ... does not constitute a 'substantial limitation' on performing manual tasks." We agree.

■ Although we have not previously considered this issue directly, we conclude

---

**3.** *See also Duncan v. Washington Metro. Transit Auth.,* 240 F.3d 1110 (D.C.Cir.2001) (en banc) ("[W]e hold that the ADA requires a plaintiff ... to produce some evidence of the number and types of jobs in the local employment market in order to show that he is disqualified from a substantial class or broad range of such jobs.").

that the district court's decision is well-supported by statutory language and by the decisions of other circuits. A "substantial limitation" is not a mere difference in an ability to perform a particular act. *Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999). The ADA is concerned only "with limitations that are in fact substantial." *Id.* That Thornton could perform certain manual tasks for only a limited period of time does not present a triable issue that she was "substantially limited" in a broad range of manual tasks.

In *Chanda v. Engelhard/ICC,* 234 F.3d 1219 (11th Cir.2000), the plaintiff suffered from tendinitis and was restricted from certain tasks, such as typing and cutting foamboard, for extensive periods of time. *Id.* at 1223. The court concluded that the employer was entitled to summary judgment, since the plaintiff had not demonstrated a substantial limitation of the major life activity of performing manual tasks:

> [W]hile Chanda's tendinitis constitutes a physical impairment, his deposition testimony and that of his doctors fails to establish a genuine issue as to any *substantial* limitation. Chanda acknowledged an ability to assist his spouse with household activities, to dress and feed

himself, and to drive an automobile. He acknowledged his ability to attend school and take four classes, all of which required the taking of notes.... In light of Chanda's ability to use his hand for the purposes acknowledged in his testimony, we conclude that his tendinitis was not the statutorily required substantial limitation on his ability to perform manual tasks.

*Id.* at 1222–23 (footnote omitted).

Similarly, in *Ouzts v. USAir, Inc.,* Civ. A. No. 94–625, 1996 WL 578514 (W.D.Pa. July 26, 1996), *aff'd,* 118 F.3d 1577 (3d Cir.1997), the court granted summary judgment to an employer on the ground that a plaintiff with carpal tunnel syndrome could not establish a "substantial limitation" of manual tasks, since she was able to perform most ordinary life activities.[4]

▇▇▇▇ In this case, Thornton was able to perform a wide range of manual tasks, including grocery shopping, driving, making beds, doing laundry, and dressing herself. Her inability to type and write for extended periods of time is not sufficient to outweigh the large number of manual tasks that she can perform. The ADA requires a "substantial limitation" in performing manual tasks,[5] and the district

---

**4.** The Sixth Circuit has suggested that the manual-tasks inquiry be further subdivided into separate sub-classes of manual tasks. *See Williams v. Toyota Motor Mfg.,* 224 F.3d 840, 843 (6th Cir.2000), *cert. granted,* —— U.S. ——, 121 S.Ct. 1600, 149 L.Ed.2d 466 (2001) (No. 00–1089). We doubt that this is the correct approach, but we note that *Williams* is distinguishable on its facts. The plaintiff in that case suffered impairments to her arm, shoulders, and neck that were so severe that the court concluded they were "analogous to having missing, damaged or deformed limbs." *Id.* Thornton's limitations do not rise to this level of severity.

**5.** Of course, Thornton may be, as the dissent argues, substantially limited in handwriting

and keyboarding. The issue of whether handwriting and keyboarding constitute major life activities, however, has not been raised on appeal. Thornton argued this point to the district court, but chose not to raise it in her opening brief to this court. The issue is therefore waived. We do not ordinarily "consider matters on appeal that are not specifically and distinctly raised and argued in [the] opening brief." *United States v. Real Prop. Known as 22249 Dolorosa St.,* 190 F.3d 977, 981 (9th Cir.1999) (internal quotation marks omitted).

Thornton's waiver of this issue limits our analysis to "substantial limitation" of "manual tasks" generally. We therefore must consider the full range of manual tasks that

court properly concluded that Thornton did not present a triable issue of material fact as to this point.

## 2. "Regarded as" Disabled

 Thornton finally contends that, even if she is not actually disabled, she was regarded as such by McClatchy. An individual is protected by the ADA if he or she is "regarded as having," 42 U.S.C. § 12102(2)(C), a "physical or mental impairment that substantially limits one or more of the major life activities of such individual," 42 U.S.C. § 12102(2)(A). McClatchy must have believed that Thornton either had a substantially limiting impairment that she did not have, or that she had a substantially limiting impairment which, in fact, was not so limiting. *Sutton,* 527 U.S. at 489, 119 S.Ct. 2139. As with real impairments, "a perceived impairment must be substantially limiting and significant." *Thompson,* 121 F.3d at 541 (internal quotation marks omitted).

 Thornton offers deposition testimony of McClatchy employees that demonstrates their awareness of Thornton's keyboarding and handwriting restrictions. McClatchy contends, and the district court agreed, that this evidence did not establish that McClatchy regarded Thornton as substantially limited in any major life activity. We agree. Thornton's restrictions did not rise to the level of substantial limitation, and there is no specific evidence that McClatchy viewed her as substantially limited. It is true that McClatchy considered a variety of measures to accommodate

Thornton's restrictions. However, when an employer takes steps to accommodate an employee's restrictions, it is not thereby conceding that the employee is disabled under the ADA or that it regards the employee as disabled. A contrary rule would discourage the amicable resolution of numerous employment disputes and needlessly force parties into expensive and time-consuming litigation. The district court properly decided this issue in McClatchy's favor.

## B. Disability under FEHA

In the proceedings below, Thornton and the district court assumed that the standard for disability under FEHA was the same as under the ADA. After this case had been fully briefed in this court, California enacted a law that states:

> The law of this state in the area of disabilities provides protections independent from those in the federal Americans with Disabilities Act of 1990 (Public Law 101–336). Although the federal act provides a floor of protection, this state's law has always, even prior to passage of the federal act, afforded additional protections [as detailed elsewhere in this act].

Cal. Gov't Code § 12926.1.

We vacate the district court's grant of summary judgment on the FEHA claims and remand for further proceedings in light of this recent enactment. We express no view on whether this act alters the district court's analysis. However, the parties should be allowed to brief the effect, if any, of this act on Thornton's FEHA claims.[6]

---

Thornton is able to perform. It is impossible to conclude, on these facts, that Thornton is so limited.

Nothing in our disposition, however, precludes a subsequent plaintiff from asserting that handwriting and keyboarding constitute major life activities and from advancing, in an appropriate case, the arguments now made by the dissent.

6. Because we base our decision to vacate on the enactment of the California statute, we do not reach McClatchy's motion to strike and its prior argument that Thornton has waived the issue of a separate standard under FEHA. Although Thornton may have waived the argument with respect to the effect of certain state court decisions, she could not have waived the effect of a statute that had not

## II. Leave to Amend the Plaintiff's Complaint

Thornton also appeals the district court's affirmation of the magistrate judge's denial of her second motion for leave to amend her complaint. Thornton sought to add a state-law claim for wrongful termination in violation of public policy. Under Rule 15 of the Federal Rules of Civil Procedure, after responsive pleadings have been filed and in the absence of the adverse party's written consent, a party may amend its complaint only by leave of the court. Such leave "shall be freely given when justice so requires." Fed. R.Civ.P. 15. We review the district court's denial of a request to amend for abuse of discretion. *Simon v. Value Behavioral Health, Inc.*, 208 F.3d 1073, 1084 (9th Cir. 2000), *cert. denied*, 531 U.S. 1104, 121 S.Ct. 843, 148 L.Ed.2d 723 (2001).

Liberality in granting a plaintiff leave to amend "is subject to the qualification that the amendment not cause undue prejudice to the defendant, is not sought in bad faith, and is not futile." *Bowles v. Reade*, 198 F.3d 752, 757 (9th Cir.1999). In this case, the magistrate judge found that the plaintiff's motion was unduly delayed, with resulting prejudice to the defendant, and that the motion was filed in bad faith.[7]

The magistrate's conclusion that Thornton's motion was filed in bad faith falls within the scope of the magistrate's discretion. The magistrate specifically referenced the plaintiff's history of dilatory tactics and the doubtful value of the proposed amendment. Both the magistrate judge and the district court supervised these parties over a lengthy period, and

their views on this fact-specific issue are entitled to considerable deference. We find no abuse of discretion on this record. *See Sorosky v. Burroughs Corp.*, 826 F.2d 794, 804 (9th Cir.1987).

As an independent ground for denial of the motion for leave to amend, the magistrate judge and the district court concluded that Thornton had needlessly delayed the filing of her motion. The magistrate judge pointed to specific evidence in the record to support his finding of undue delay. He noted Thornton's failure to pursue the proposed claim and that amendment at such a late date in the proceedings would prejudice McClatchy. The district court agreed with Thornton that such prejudice would be "limited," but was unable to conclude that the magistrate's decision was clearly erroneous or contrary to law. This decision was well within the discretion of the district court. *See Ascon Props., Inc. v. Mobil Oil Co.*, 866 F.2d 1149, 1161 (9th Cir.1989).

### Conclusion

For the reasons explained, we affirm the district court's grant of summary judgment on Thornton's ADA claims, vacate and remand the FEHA claims, and affirm the denial of leave to amend the complaint.

**AFFIRMED IN PART, VACATED IN PART, AND REMANDED.** Each party to bear its own costs on appeal.

BERZON, Circuit Judge, concurring in part and dissenting in part:

I concur in the majority's "regarded as disabled," Fair Employment and House Act, and Leave to Amend holdings, Parts

---

been enacted when the opening brief was filed.

7. Prior to the decision on this motion, the magistrate judge and the district court both rejected Thornton's previous attempt to

amend her complaint. Both found Thornton's motion was filed in bad faith. Thornton does not appeal this decision, so the prior finding of bad faith remains the law of the case.

I(A)(2), I(B), and II of the majority opinion. I dissent, however, from the majority's holdings that Jacalyn Thornton has not established that she is "substantially limited" in the "major life activities" of performing manual tasks or working, 42 U.S.C. § 12102(2)(A), that is, from Parts I(A)(1)(a) and (b) of the majority opinion.

Thornton, a longtime newspaper reporter, submitted evidence that she now cannot use a keyboard continuously for more than 30 minutes, or intermittently for more than 60 minutes per day, and therefore cannot use a computer in the normal manner for longer than the specified time limits. She also cannot handwrite continuously for more than 5 minutes, or intermittently for more than 60 minutes per day.[1] The Fresno Bee's human resources director stated that, of over 200 Fresno Bee employees who had been accommodated for various disabilities, Thornton's "restrictions were probably the most severe I had seen related to repetitive strain type of injury."

The majority concludes, nonetheless, that because Thornton could perform some other tasks involving the use of her arms and hands—picking groceries off shelves, making beds, putting clothes in a washing machine, driving locally, and dressing herself—the fact that she is severely limited in using her arms and hands to perform the manual tasks involved in communicating in written form is not a "substantial limitation" in performing manual tasks within the meaning of the Americans with Disabilities Act ("ADA"). *Ante* at 797.[2] As such, the majority's analysis of this issue is purely quantitative, premised not on the significance of the particular manual tasks that Thornton *cannot* do but on whether there are a "large number of manual tasks that she can perform." *Id.* And the majority's analysis, it is worth noting, does not turn at all on whether Thornton is *entirely* or only partially unable to use a computer keyboard or to write. Rather, as far as I can tell, the majority would come to the same conclusion it did here were the plaintiff unable to use a computer in the usual fashion or write at all, as long as she could still perform a substantial number of other manual tasks involved in daily life.

Someone missing a dominant hand but fitted with an effective prosthesis, for example, could probably perform effectively most of the tasks the majority relies upon as demonstrating that Thornton is not disabled in performing manual tasks—including grocery shopping, making beds, doing

---

**1.** There is some evidence in the record tending to disprove the documents and testimony Thornton submitted concerning the extent of her disability—namely, evidence indicating that she engaged in activities after leaving her reporting job that required writing and keyboarding, although the amount of time spent on those activities continuously and intermittently is not specified. That evidence indicates that there may be a genuine issue of material fact regarding the extent of her disability. It does not, however, alter the basic legal questions involved in this appeal from the district court's entry of summary judgment in favor of McClatchy—whether, on the evidence *as presented by Thornton*, she has met her burden of demonstrating a disability under the Americans with Disabilities Act. *See*

*Beck v. Prupis,* 529 U.S. 494, 498 n. 3, 120 S.Ct. 1608, 146 L.Ed.2d 561 (2000).

**2.** Thornton is also impaired, although to what extent is unclear, from performing other manual tasks, including ironing, vacuuming, shampooing, and certain food preparation procedures (including chopping and opening jars). For purposes of this dissent, however, I focus on the questions whether severe limitations in performing the manual tasks necessary to conduct written communication can establish a substantial limitation in carrying out manual tasks to constitute a disability under the ADA, and whether the evidence in this case showing such limitations did establish a disability sufficient to withstand a motion for summary judgment.

laundry, and dressing herself—but would probably be entirely unable to perform tasks such as keyboarding and writing, involving fine motor coordination skills. Such a person, according to the majority, is not "disabled." *See Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 475, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999) ("[T]he determination of whether an individual is disabled should be made with reference to measures that mitigate the individual's impairment....").

As I show below, the majority's "manual tasks" holding has broad ramifications not only in the employment context but also in other applications of the ADA—most notably, in educational and test-taking contexts. And the holding is incorrect: In determining whether an inability to perform some but not all manual tasks is a "substantial limitation," the court should focus (1) on whether the nature of the manual tasks that the individual *cannot* perform is such that they are of major importance in the daily lives of modern Americans generally, including (but not only) their lives at work, and (2) if so, the extent to which the particular plaintiff's impairment in performing those tasks impacts her life, focusing on the nature, severity, and duration of the plaintiff's limitations. *See McAlindin v. County of San Diego*, 192 F.3d 1226, 1233 (9th Cir.1999), *amended on denial of reh'g*, 201 F.3d 1211 (9th Cir.2000), *cert. denied*, 530 U.S. 1243, 120 S.Ct. 2689, 147 L.Ed.2d 961 (2000); *Sutton*, 527 U.S. at 483, 119 S.Ct. 2139; 29 C.F.R. § 1630.2(j)(2).

### I

### *Importance of Computer Usage*

It should not be necessary to prove that the ability to use one's arms and hands to produce, by computer (or by handwriting), written communications and records is a manual skill of enormous importance in our literate and technological society, and thus "in the life of the average person." *McAlindin*, 192 F.3d at 1233–34. The majority opinion, however, ignores this reality, treating the inability to perform the manual tasks of writing and keyboarding as equivalent to, for instance, the inability to perform the task of "cutting foamboard." *Ante* at 797 (citing *Chanda v. Engelhard/ICC*, 234 F.3d 1219 (11th Cir. 2000)). It is therefore worth documenting a bit the degree to which writing has long been, and computer use has become, ubiquitous in contemporary life.

We learn to write, of course, in kindergarten or before, in part because the rest of our education depends upon the ability to take notes, produce written homework, compose written papers, and take written examinations, and in part because the same skill has long been necessary after one's education is over, to keep personal and business records, fill out forms, write notes and letters, and produce business communications and reports.

Students today learn to use computers at a similarly early age, while those of us who missed this opportunity attempt to compensate by taking computer classes, reading one or more of the numerous computer instruction books available, or learning by simple trial and error. We now use computers, ordinarily with keyboards, in accessing the Internet and library data bases for information or recreation; in sending letters or e-mails; in financial planning, paying bills, making shopping lists, and writing notes to ourselves and family members; and, of course, in school and in a vast array of work settings.

Indeed, "[n]o one can realistically expect to be successful in our world of mega-information without being able to use a computer." Carl W. Battle, *Smart Maneuvers: Taking Control of Your Career and Personal Success in the Information Age* 106 (1994). "At work, school, and

home, the personal computer has become a basic tool." U.S. Census Bureau, *Computer Use in the United States* at 8 (Sept. 1999) (hereinafter "*Census* "), at 1.

Statistics bear out what we all know anecdotally concerning the pervasive use of computers in our daily lives: As of 1997, more than 63.9 million Americans–49.8 percent of all working Americans–used a computer at work. *Id.* at 6–7. Computer use in the workplace cuts across a broad range of occupations and industries. More than 74 percent of managerial and professional workers and more than 68 percent of technical, sales, and administrative workers used a computer at work in 1997. *Id.* at 8. The finance, insurance, real estate, public administration, services, and communications, and even retail trade and manufacturing industries, had high computer use, ranging from over 45 percent to over 81 percent. *Id.* at 8–9. And computer use is widespread outside the workplace as well; in 1997 more than 47 percent of all adult Americans, including the unemployed and retired, used a computer at work, at home, or at school. *Id.* at 1.

An even greater number of children used computers in 1997 than did adults, with more than 74 percent of children using a computer at home or school. *Id.* As Justice O'Connor recently explained, "computers are now as necessary as were schoolbooks 30 years ago, and they play a somewhat similar role in the educational process." *Mitchell v. Helms*, 530 U.S. 793, 852, 120 S.Ct. 2530, 147 L.Ed.2d 660 (2000) (O'Connor, J., concurring). President Clinton acknowledged the highly significant role of computers both in education and in employment by committing the federal government to "making modern computer technology an integral part of every classroom" in order "to ensure that American children have the skills they need to succeed in the information-intensive 21st century...." Exec. Order 12999, 61 Fed. Reg. 17227 (April 17, 1996).

The fact that using a computer is so essential to modern life that teaching that skill universally has become embedded in our national educational policy must inform our understanding of the ADA's disability definition, for two reasons:

First, the ADA is a statute addressed generally to the opportunities of the disabled for success in modern society. That a particular manual skill is of such importance to success in life that it is now taught to most children and used pervasively throughout their schooling is surely some indication that, like reading, spelling, and adding, it is a skill essential to such success.

Second, and critically, the ADA definition of disability at issue in this case applies not only in the employment context but in educational and testing settings as well, to determine whether reasonable accommodations are required. Section 12102(2), the section of the ADA that defines "disability," applies to all three titles of the statute: Title I (employment); Title II (public services); and Title III (public accommodations). *Sutton*, 527 U.S. at 479, 119 S.Ct. 2139. Titles II and III cover such activities as school course work and standardized testing for secondary and post-secondary education and professional licensing purposes. *See Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69 (2d Cir.2000) (Title II); *Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620 (6th Cir.2000) (Title III). Likewise, the Rehabilitation Act of 1973, which prohibits discrimination in programs or activities receiving federal funding, uses the same definition of "disability" as the ADA. *See* 29 U.S.C. § 705(9); 42 U.S.C. § 12201(a); *see also* 28 C.F.R. pt. 36, App. B § 36.103 ("The standards of ... the Rehabilitation Act apply for purposes of the ADA to the

extent that the ADA has not explicitly adopted a different standard. . . .").

Consequently, if a person who is seriously impaired in using her arms and hands to use a keyboard (or write) cannot be disabled for the employment provisions of the ADA unless he or she is also unable to perform most other manual tasks, however diverse, then, as far as I can see, such a person is not disabled, and need not be accommodated, in education or test-taking settings either. The question whether an inability to use a keyboard, as well as to write, is a substantial impairment with regard to the major life activity of performing manual tasks must therefore take into account the role of keyboarding and writing skills as manual tasks used by students in educational and test-taking settings.

The sum of the matter is that the ability to use one's arms and hands to operate a computer and handwrite is, in the modern world, a skill that is essential both in getting an education and in earning a living, and is useful in carrying out many activities of daily life. The question before us is whether Congress, in enacting the ADA, blinkered this reality and, as the majority holds, determined that individuals who cannot carry out the manual tasks involved in written communication are not substantially impaired in carrying out manual tasks as long as they can carry out a number of other tasks requiring the use of their arms and hands.

## II

### *Substantial Impairment in Performing Manual Tasks Under the ADA*

Looking carefully at all of the available legislative materials, I see no evidence that Congress sanctioned this quantitative, en masse approach to determining whether a severe impairment with regard to certain manual tasks critical in modern society constitutes a "disability" under the Act. To the contrary, the purposes, history, structure, and developed interpretation of the Act taken as a whole all point toward the opposite conclusion—that some particular manual tasks, such as keyboarding and writing, are of such independent weight in their impact on contemporary life that severe impairment in carrying out those tasks can be a substantial limitation with regard to the major life activity of performing manual tasks generally.

### 1. *Major Life Activities*

Title I of the ADA prohibits discrimination in employment against disabled individuals and specifically applies to those individuals who can perform the essential functions of a job with or without reasonable accommodation. 42 U.S.C. § 12111(8). The Act defines "disability" as "a physical or mental impairment that substantially limits one or more of the major life activities of such individual." § 12102(2)(A). The Act does not define "substantial limitation" or "major life activity," nor are those terms self-defining.

Congress has, however, provided guidance as to its general intent, informative in applying the undefined terms. First, Congress in the ADA itself declared the overriding purpose of the statute:

> [T]he Nation's proper goals regarding individuals with disabilities are to assure equality of opportunity, full participation, independent living, and economic self-sufficiency for such individuals. . . .

42 U.S.C. §§ 12101(a)(8). *Cf. Sutton*, 527 U.S. at 484–87, 119 S.Ct. 2139 (relying on the ADA's statement of findings to discern Congress' intent). Similarly, the Senate Report and House Reports state that the purpose of the ADA is "to bring persons with disabilities into the economic and social mainstream of American life." *E.g.*, S.Rep. No. 101–116, at 2 (1989); H.R.Rep.

No. 101–485(II), at 22 (1990), *reprinted in* 1990 U.S.C.C.A.N. 303.

This articulated purpose indicates that the interpretation of the undefined ADA terms here critical must take account of the realities of life in today's highly literate and technological society. Otherwise, Congress' goals of "economic self-sufficiency" and "independent living" for the disabled could not be achieved. Only by considering the significance of an activity in the context of our society as it exists today can we determine what constitutes a major life activity: The physical ability to use a bow and arrow to hunt for one's food might have been an important aspect of the major life activity of performing manual tasks 2,000 years ago, but today it probably would not be.

Court decisions, in accord with this Congressional intent, have recognized that the delineation of "major life activities" must take account of economic or social—not purely biological—factors. In *McAlindin*, 192 F.3d at 1233–34, we defined "major life activities" as activities "significant in the life of the average person," and explained that to determine whether a life activity is "major," courts should examine "the number of people who engage in" it, a standard that incorporates the physical and social realities of peoples' lives. In particular, we concluded that "interacting with others," a quintessentially public, social function, constitutes a "major life activity." *Id.* at 1234. Thus, while major life activities

are not *confined* "to those with a public, economic, or daily aspect," *Bragdon*, 524 U.S. at 639, 118 S.Ct. 2196, skills with those aspects *are* quintessential parts of the activities that are covered by the ADA.

The EEOC's interpretive regulations, unlike the statute, do define "major life activities" to some degree—as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i);[3] *see also* 28 C.F.R. § 35.104 (Department of Justice's regulation defining "major life activities" in the same way for purposes of interpreting Title II of the ADA); 28 C.F.R. § 36.104 (same for Title III).[4] The EEOC's inclusion of "learning" and "working" in the litany of "major life activities" reflects the understanding that the ADA promotes disabled individuals' ability to attain "economic self-sufficiency," 42 U.S.C. § 12101(a)(8), and to enter "the economic and social mainstream of American life." *E.g.*, S. Rep. 101–116; H. Rep. 101–485(II).

At the same time, the regulations' list of "major life activities" is clearly overlapping, not discrete. Many jobs, and most education, as usually carried out require seeing, hearing, and walking, as well as performing manual tasks. As the statute speaks of "major life activities" generally, there is no basis, in light of the overall purposes of the statute, to construe only some "major life activities" as important for participation in the larger society

---

**3.** Although Congress authorized several agencies to issue regulations interpreting Titles I, II, and III of the ADA, *see* 42 U.S.C. § 12116, 12134, 12149, no agency was expressly authorized to issue regulations construing the generally applicable definition section of the statute. *Sutton*, 527 U.S. at 479, 119 S.Ct. 2139. The interpretive regulations, nonetheless, are generally useful for guidance, especially when they are not challenged but instead, as here, are relied upon by the parties to the case. *Cf. Sutton*, 527 U.S. at 480, 119 S.Ct. 2139;

*McAlindin*, 192 F.3d at 1233 n. 6. Additionally, because the particular regulations defining "major life activities" mimic the parallel regulation under the Rehabilitation Act, they enjoy a statutory imprimatur: As *Bragdon* recognized, under 42 U.S.C. § 12201(a), "the ADA must be construed to be consistent with regulations issued to implement the Rehabilitation Act." 524 U.S. at 638, 118 S.Ct. 2196.

**4.** This list is "illustrative, not exhaustive." *Bragdon*, 524 U.S. at 639, 118 S.Ct. 2196.

but others as pertinent only to personal well-being.

All of these interpretive aids point, in my view, in one direction: In considering the nature of a multifaceted "major life activity" in order to determine later the scope of an individual's limitations, a primary emphasis should be a practical one, focused upon the aspects of that activity of greatest importance in fostering participation in modern society. Examples using other "major life activities" may clarify what I mean.

"Seeing" is a major life activity. In deciding whether someone is "substantially limited" in seeing, I would suppose it would be all-important whether the person could see well enough to read, because reading is of such transcendent importance in making one's way in the modern world. That the individual could see well enough to dress herself, do her laundry, and cook would, presumably, not detract from the fact that she was "substantially impaired" in seeing because she could not read, given the critical importance of reading to self-sufficiency in life.

Similarly, "learning" is a major life activity, one with many components. *See* Howard Gardner, *Frames of Mind: The Theory of Multiple Intelligences* (1993). If someone were unable to learn to read and write,[5] we would not say that she is not disabled with regard to learning, because she is a whiz at mathematics, a wonderful musician, and picks up social skills easily. On the other hand, the fact that another person could not learn music would not be a substantial limitation with regard to learning, without more—because learning music, while interesting, enjoyable, and useful for some vocational purposes, is not essential to effective participation in modern society.

Similarly, while individuals perform many tasks with their arms and hands, all such tasks are not coequal in importance, nor are the tasks involving biological survival (feeding oneself, for example) or personal care of greater significance for purposes of the ADA than those essential to participation in the larger contemporary society.

## 2. Thornton's Substantial Limitation in Performing Manual Tasks

**A.** Although the ADA itself does not define the term "substantial limitation" any more than it defines "major life activity," the Supreme Court's precedents and the EEOC's interpretative regulations once again provide guidance. The Supreme Court has explained that a "substantial limitation" is more than "a mere difference" in the plaintiff's ability to perform a major life activity, and must be "in fact substantial." Yet, ADA protection is not limited to individuals with "'utter inabilities.'" *Albertsons, Inc. v. Kirkingburg*, 527 U.S. 555, 565, 119 S.Ct. 2162, 144 L.Ed.2d 518 (1999) (quoting *Bragdon*, 524 U.S. at 641, 118 S.Ct. 2196). Likewise, the Court in *Sutton* stated that "'substantially' suggests considerable or specified to a large degree." 527 U.S. at 491, 119 S.Ct. 2139 (citation and other internal marks omitted).

The EEOC, in turn, defines "substantially limited" as:

(i) Unable to perform a major life activity that the average person in the general population can perform; *or*

(ii) *Significantly restricted as to the condition, manner or duration* under which an individual can perform a particular major life activity *as compared to* the condition, manner, or duration under

---

**5.** I note that *learning* to read and write are discrete activities from reading and writing.

Thornton, for example, *knows* how to write but now is severely limited from doing so.

which *the average person in the general population* can perform that same major life activity.

29 C.F.R. § 1630.2(j)(1) (emphases added). Factors to consider in determining whether an impairment is "substantially limiting" include the "nature" as well as the severity and duration of the impairment. 29 C.F.R. § 1630.2(j)(2).

Of particularly great importance to the current case is a dichotomy that the majority ignores: While major life activities are defined by their importance in the lives of people in general, *McAlindin,* 192 F.3d at 1233–34, the ultimate determination of whether a person is substantially limited as to a particular activity or class of activities, and therefore has a disability under the ADA, requires an "individualized inquiry." *Sutton,* 527 U.S. at 483, 119 S.Ct. 2139 (citing *Bragdon,* 524 U.S. at 641–42, 118 S.Ct. 2196 and 29 C.F.R. pt. 1630, App. § 1630.2(j)) ("The determination of whether an individual has a disability is not necessarily based on the name or diagnosis of the impairment the person has, but rather on the effect of that impairment on the life of the individual.").

"Substantial impairment" analysis, then, requires a focus on (1) the *nature* of the impairment—that is, exactly what is it that the individual cannot do; and (2) how seriously that inability affects the life of the individual concerned, a consideration that depends upon knowledge of that person's life circumstances. In making that determination, there is no basis for leaving out—as the district court did in this case [6] —or minimizing—as does the majority's en

masse, quantitative approach to assessing the significance of various manual tasks— tasks that a grown individual performs in the workplace, any more than there is a basis for leaving out the tasks that a student performs in school. Nor is there any basis for focusing on tasks that involve biological survival or personal care, rather than participation in the larger society.

**B.** Putting the pieces of the puzzle together, I conclude that (1) an inability to perform the manual tasks involved in operating a computer and handwriting *can* be a sufficiently substantial impairment in the performance of manual tasks to constitute a disability, and (2) given Thornton's personal circumstances, the inability either to operate a computer or write by hand *does* substantially limit her ability to participate in contemporary society.

**(i)** As to the first point, concerning whether the inability physically to commit words to paper *can* be a substantial limitation in performing manual tasks: Following the lead of the Rehabilitation Act regulations, *see* n. 3, *supra,* the current articulation in the administrative regulations refers to "manual tasks" as a group as an example of a "major life activity." Yet, performing manual tasks involves the use of arms, hands, fingers, and many individual muscles and bones, as well as hand-eye coordination mediated by the brain; different kinds of physiological problems can result in widely varying impacts, resulting in the ability to carry out some "manual tasks" but not others.

---

**6.** The district court reached the same result as the majority by describing the only activities that Thornton could *not* do—"housework beyond basic chores, participating in certain sporting activities, and performing certain cooking tasks," and then concluding that these tasks constituted too "narrow" a range of tasks to indicate that Thornton was substantially limited in the manual tasks major

life activity. The district court's utter exclusion of Thornton's writing and keyboarding restrictions from its manual tasks analysis can only be explained by an assumption that tasks that are useful in earning a living, although useful for other purposes as well, for some reason do not count at all, in substantial limitation analysis.

There is no basis in the statute, or in the regulation, for concluding that an individual must demonstrate a limitation in each and every possible manual task, or in some proportion of all the possible manual tasks in the world, in order for the person to qualify as "substantially limited."[7] 29 C.F.R. § 1630.2(i). Rather, where the "nature" of an individual's impairment is such that she cannot carry out the particular physiological tasks essential to communicating in writing, her impairment in carrying out manual tasks *can* be sufficiently substantial simply because of the importance of those particular manual tasks in modern society.

Any doubt in this regard is resolved by the provisions of the statute itself, as well as by statutory interpretations, of particular pertinence in the educational field:[8]

*First,* Congress expressly included educational and professional courses and ex-

aminations in the ADA. *See* 42 U.S.C. § 12189. The Department of Justice issued a regulation pursuant to § 12189 specifying that any examination must be

selected and administered so as to best ensure that, when the examination is administered to an individual with a disability that impairs sensory, *manual,* or speaking skills, the examination results accurately reflect the individual's aptitude or achievement level ..., rather than reflecting the individual's impaired sensory, *manual,* or speaking skills....

28 C.F.R. § 36.309(b) (emphases added); *see also* 34 C.F.R. §§ 104.13(b), 104.35(b)(3), 104.42(b)(3) (Department of Education regulations pursuant to the Rehabilitation Act using similar language for preschool through post-secondary education and employment testing). These regulations also explain that an appropriate "auxiliary aid," which the entity admin-

7. The majority concluded that Thornton waived the issue of whether written communication alone constitutes a major life activity. Whether or not that is the case, Thornton did *not* waive the contention that in considering whether an individual is impaired in performing manual tasks, an inability to perform the tasks involved in using a computer and writing is entitled to particular weight. Rather, her "manual tasks" argument—sketchy as it is—does assert that she is substantially limited in performing that class of major life activities primarily because of her writing and keyboarding limitations.

 I note, additionally, although the point is not of particular consequence to this dissent, that I do not think that Thornton did waive the issue of whether written communication alone constitutes a major life activity. In her briefs, Thornton claimed that her limitations in writing and keyboarding constituted a substantial limitation in a major life activity-exactly what the ADA requires a plaintiff to show to establish disability. *See* 42 U.S.C. § 12102(2)(A). The statute itself does not divide major life activities into various categories; it is the regulation's non-exhaustive categorization of major life activities, *Bragdon,* 524 U.S. at 639, 118 S.Ct. 2196, not Thorn-

ton's claim under the statute itself, upon which the majority relies to determine that Thornton waived this issue. Nor do the EEOC's regulations indicate that "manual tasks" is necessarily *one* "major life activity," rather than a group of such activities. Where the party's argument sufficiently flags the relevant statutory and regulatory provisions and amasses pertinent facts, the language used to refer to the argument should not determine whether a legal argument has been waived. *Cf., Benitez–Pons v. Commonwealth of Puerto Rico,* 136 F.3d 54, 61 (1st Cir.1998) (where plaintiff "muddles the doctrines of equitable estoppel and equitable tolling [but] ... asserts elements of both doctrines, we will analyze the equitable arguments under both estoppel and tolling theories.").

8. I have already explained why educational applications of the "substantially limits ... one or more of the major life activities" definition of disability should be taken into account in construing the same language in the employment context—that all parts of the statute share a single disability definition, so that the same basic concepts should govern in all the contexts covered by the ADA. *See* pp. 802–03, *supra.*

istering the examination must provide (unless it would fundamentally alter the test or impose an undue burden), includes "transcribers for individuals with manual impairments." § 36.309(b); *see also id.* at (c) (requiring auxiliary aids for individuals with manual impairments in the classroom).

These regulations appear to focus exclusively upon the impact of manual impairments on the educationally-related manual skills of communicating in writing, without requiring that the impaired individual also be impaired in carrying out a wide range of other manual tasks. Any other understanding would make little sense: If a student is impaired with regard to fine motor skills and cannot write or use a computer, the fact that she has no problem dressing herself or cleaning her room is not going to be of much help to her in getting an education.

*Second,* in accord with this understanding of the statute and the regulations, the Department of Education's Office for Civil Rights has specifically held that the inability to write is a substantial limitation in the major life activity of performing manual tasks. *See University of Colorado,* 1993 NDLR (LRP) LEXIS 1156; 4 NDLR (LRP) 211 (OCR June 30, 1993). The OCR explained:

> The complainant's medical records indicate that she has rheumatoid arthritis in her hands which substantially affects her ability to write. The ability to perform manual tasks is recognized as a major life activity [under the Rehabilitation Act]. *Because the complainant's condition substantially limits a major life activity,* and she met the technical standards for admission, OCR finds that the complainant was a qualified handicapped person....

*Id.* at \*3–\*4 (emphasis added). In coming to this conclusion, OCR did not ask whether the student could drive, do her own laundry, cut foamboard, *see Chanda,* 234 F.3d at 1223, or grip tools "with hands and arms extended at or above shoulder levels for extended periods of time." *See Williams v. Toyota Motor Mfg. Kentucky, Inc.,* 224 F.3d 840, 843 (6th Cir.2000), *cert. granted,* —— U.S. ——, 121 S.Ct. 1600, 149 L.Ed.2d 466 (Apr. 16, 2001). Rather, the agency recognized that given the importance of written communication to success in modern society, an impairment the "nature" of which impedes the physical ability to communicate in writing can itself be a "substantial limitation" in the activity of performing manual tasks.

**(ii)** As to the second point, whether Thornton's life circumstances were such that her difficulties with using her hands and arms to put words to paper (or computer screen) was a substantial limitation in performing the manual tasks important to *her* life:

Thornton's 25 year career in journalism has depended upon her ability to engage in written communication. Indeed, committing words to paper (or, now, computer) is the nub of her chosen profession, and, as such, is both what she has spent a large percentage of her waking hours doing for many years and the core of her economic well-being. That she can still dress herself, drive, and do the laundry does not detract from this reality, any more than such residual skills detract from the reality that a test-taker who cannot write or use a computer is not going to demonstrate his or her relevant aptitude or achievement on a written examination unless accommodated. Moreover, McClatchy's doctor diagnosed Thornton's injury as permanent, providing additional strong evidence that Thornton's limitations in performing manual tasks are substantial. *Cf. Chanda,* 234 F.3d at 1223 (finding summary judgment for the defendant appropriate where the plaintiff acknowledged that he could re-

sume, after having completed a medical leave, the manual tasks in which he claimed limitations).

So Thornton is permanently limited in carrying out manual tasks that for most people are critical to participation in contemporary society, as well as critical to the manner in which she herself has heretofore led her life. As such, she is substantially limited in performing manual tasks.

(iii) I emphasize that my approach to this statutory maze will *not* result in finding a substantial limitation in performing manual tasks whenever an employee is substantially impeded in carrying out the manual tasks involved in carrying out his or her job, for three reasons: For one thing, I would require, *before* any individualized inquiry, an inquiry into the general, societal importance of the particular manual task. Additionally, the particular manu-

al task here at issue, using one's arms and hands physically to communicate in writing, is one as to which there is specific statutory and administrative attention and recognition, recounted above; I do not believe that that is true with regard to any other major subspecies of "manual tasks." And third, in looking at the impact of a limitation in performing manual tasks on an individual, I would consider both the longevity of that individual's dependence on that task and the permanence of the impairment.

The majority applied, instead, a vaguely-articulated standard that takes no account of either modern social and economic realities or the role of such practical considerations in applying the ADA's disability definition. I therefore respectfully dissent.[9]

**9.** As noted at the outset, I also believe that the majority's analysis concerning the major life activity of "working" is wrong. In particular, I do not agree with the majority's reading of *Broussard v. University of California,* 192 F.3d 1252 (9th Cir.1999) as requiring in *all* instances that the plaintiff bring forward specific evidence about relevant labor markets to defeat summary judgment on a claim of substantial limitation in the major life activity of working. *Ante* at 795–96. Rather, the *Broussard* court's foremost concern appears to have been that the vocational specialist in that case drew conclusions about the plaintiff's capacity to perform various jobs based on a fundamental misreading of the medical and vocational evidence concerning her physical restrictions. 192 F.3d at 1258–59. Moreover, the plaintiff's job, animal technician, was specialized and unusual; faced with evidence that Broussard, a laboratory technician, had difficulty feeding laboratory mice by hand, no jury reasonably could have determined, without more, that her impairments precluded her from performing any broad range of jobs or class of jobs. Here, in contrast, the impact of the inability to use a keyboard or to handwrite on Thornton's labor market participation is a matter of common knowledge, not requiring expert evi-

dence at the summary judgment stage. *Compare Wellington v. Lyon County Sch. Dist.,* 187 F.3d 1150 (9th Cir.1999) (affirming a finding of substantial limitation in the major life activity of "working" without requiring expert labor market evidence, where the scope of limitation could be surmised from the record and common knowledge.)

I do not address further the "working" major life activity issue, however, both because the majority's error is neither so plain nor so devastating in its impact as its "manual tasks" holding, and because we have been directed to consider major life activities other than "working" in the first instance. *See Sutton,* 527 U.S. at 492, 119 S.Ct. 2139 (quoting 29 C.F.R. pt. 1630, App. § 1630.2(j)) (noting that the major life activity of "working" is somewhat circular, and that the EEOC recommends determining whether an employee is substantially impaired in some other major life activity before addressing whether she was so limited in the major life activity of working). This last, sensible direction, I note, refutes once more any contention that work-related activities must be antiseptically separated out or down-played in determining substantial limitation in a discrete major life activity.