**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

ANDREW H.K. WONG,
   *Plaintiff-Appellant,*

   v.

REGENTS OF THE UNIVERSITY OF
CALIFORNIA,
   *Defendant-Appellee.*

No. 01-17432

D.C. No.
CV-96-00965-
LKK(DAD)

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
REHEARING AND
PETITION FOR
REHEARING EN
BANC AND
AMENDED
OPINION

Appeal from the United States District Court
for the Eastern District of California
Lawrence K. Karlton, Senior District Judge, Presiding

Argued and Submission Deferred February 12, 2003
Submitted April 17, 2003
San Francisco, California

Filed August 18, 2004
Amended June 7, 2005

Before: Robert R. Beezer, Sidney R. Thomas and
Richard R. Clifton, Circuit Judges.

Opinion by Judge Clifton;
Dissent by Judge Thomas

6427

**COUNSEL**

Dan Siegel (argued), Hunter Pyle, Siegle & Yee, Oakland, California, for the plaintiff-appellant.

Michael T. Lucey, Michael D. Bruno, Joel K. Liberson (argued), Gordon & Rees LLP, San Francisco, California, for the defendant-appellee.

**ORDER**

The majority opinion filed on August 18, 2004, is amended as follows:

At 379 F.3d at 1108, replace the first sentence of the paragraph which begins "Regarding the activity of learning . . . ," with the following:

> Regarding the activity of learning, Wong's claim to be "disabled" was contradicted by his ability to achieve academic success, and to do so without special accommodations.

At 379 F.3d at 1108-09, replace the paragraph which begins on page 1108 and extends to the next page with the following:

> The relevant question for determining whether Wong is "disabled" under the Acts was not whether he might be able to prove to a trier of fact that his learning impairment makes it impossible for him to keep up with a rigorous medical school curriculum. It was whether his impairment substantially limited his ability to learn as a whole, for purposes of daily living, as compared to most people. The level of academic success Wong achieved during the first two years of medical school, without any special accommodation provided to him by the school, made that proposition implausible. His record was to the contrary. Because the factual context made implausible his contention that he was disabled in the activity of "learning" as compared to most people, he was required to "come forward with more persuasive evidence than otherwise would be necessary to show that there is a genuine issue for trial." *Blue Ridge Insurance Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). He did not present sufficient evidence in support of his contention to establish a triable issue of fact.[6]

The next sentence, beginning "As for the activity of reading . . . ," starts a new paragraph (correctly shown at Slip op. at

11562, but incorrect at 379 F.3d at 1109). That paragraph is otherwise unchanged.

At 379 F.3d at 1109, delete the first paragraph of footnote 6 such that the footnote consists only of the remaining paragraph.

The dissenting opinion of Judge Thomas is amended, on 379 F.3d at 1110, by deleting the sixth sentence of the first paragraph, which is the sentence beginning with the words "At a minimum, . . . ."

With the opinions as amended, Judges Beezer and Clifton have voted to deny the petition for rehearing. Judge Thomas has voted to grant the petition for rehearing.

Judge Clifton has voted to deny the petition for rehearing en banc, and Judge Beezer so recommends. Judge Thomas has voted to grant the petition for rehearing en banc.

A judge of the court called for a vote on the petition for rehearing en banc. A vote was taken, and a majority of the active judges of the court failed to vote for en banc rehearing. Fed. R. App. P. 35(f).

The petition for rehearing and petition for rehearing en banc, filed on September 8, 2004, are DENIED.

No further petitions for rehearing will be entertained.

---

## OPINION

CLIFTON, Circuit Judge:

Andrew H.K. Wong alleges that the University of California discriminated against him in violation of the Americans

with Disabilities Act ("ADA") and the Rehabilitation Act[1] when it denied his request for learning disability accommodations and subsequently dismissed him for failure to meet the academic requirements of the medical school at the University's Davis campus. The district court granted the University's motion for summary judgment, concluding that Wong failed to present a triable issue of material fact as to whether he was "disabled" and thus legally entitled to special accommodations under those Acts.

Wong's appeal thus requires us to consider the meaning of "disabled" under the Acts. More specifically, it presents a question of whether a person who has achieved considerable academic success, beyond the attainment of most people or of the average person, can nonetheless be found to be "substantially limited" in reading and learning, and thus be entitled to claim the protections afforded under the Acts to a "disabled" person.

This appeal also raises an issue regarding the exclusion of testimony by the district court on the ground that the expert witnesses in question were not timely identified. The district court excluded certain experts retained by Wong to respond to the University's motion for summary judgment. Those witnesses were identified by Wong after a deadline set by the district court for identifying expert witnesses. Wong contends that the tardy identification was justified because he could not reasonably have anticipated the need for those witnesses, since he did not know that the University disputed his claim to be disabled under the Acts. He further contends that the late identification was harmless, given that the case had a scheduled trial date several months after the supplemental, though tardy, identification.

---

[1]Because Title II of the ADA, 42 U.S.C. § 12132, and section 504 of the Rehabilitation Act, 29 U.S.C. § 794, create the same rights and obligations, they will be referred to jointly here as "the Acts." *See Wong v. Regents of the Univ. of California*, 192 F.3d 807, 811 n.2 (9th Cir. 1999).

We affirm. We conclude that the district court did not abuse its discretion in declining to permit Wong to add the additional witnesses. The need for those witnesses could reasonably have been anticipated prior to the supplemental identification of witnesses. We also conclude that the evidence before the district court did not establish a genuine issue of material fact as to whether Wong qualified under the Acts as disabled. Wong contends that he has an impairment which "substantially limits [him in] one or more of the major life activities" and thus fits within the definition of "disabled." *See* 42 U.S.C. § 12102(2)(A). The Supreme Court has concluded, however, that "these terms need to be interpreted strictly to create a demanding standard for qualifying as disabled." *Toyota Motor Mfg. Kentucky, Inc. v. Williams,* 534 U.S. 184, 197 (2002). Interpreting those terms strictly and applying that demanding standard, Wong has not demonstrated that he is substantially limited in major life activities. We therefore affirm the district court's judgment in favor of the University.

## I.  BACKGROUND

This court previously considered Wong's disability discrimination claim in 1999, after the district court entered summary judgment in favor of the University on different grounds. We reversed the district court's order and remanded for further proceedings, concluding that genuine issues of material fact remained as to the reasonableness of the accommodation in question and as to whether Wong was otherwise qualified to meet the medical school's academic standards. *Wong v. Regents of the Univ. of California,* 192 F.3d 807, 826 (9th Cir. 1999) ("*Wong I*"). Subsequently, the district court entered summary judgment again, on a different ground, concluding that Wong had not shown that he qualified as disabled under the Acts. The current appeal presents the question of whether the district court's second entry of summary judgment was proper.

The facts of this case are outlined in detail in *Wong I*, 192 F.3d at 811-16. We briefly recount pertinent elements here, along with the history of the case subsequent to our previous decision.

As the district court observed, Wong's academic history has been filled with contradictions. In kindergarten he was identified as suffering from a learning impairment, but in grammar school he was certified as a gifted student. In middle school he was assigned to a special class for assisted learning. While attending high school and college, he regularly requested extra time on assignments and essay examinations. To keep up with his college classes, he said that he spent all of his extra time outside of school reading for his classes. The effort paid off, however, for he graduated from San Francisco State University, magna cum laude, earning a B.S. in biochemistry with a cumulative grade point average of 3.54 out of 4.0. Wong went on to earn a master's degree in cellular/molecular biology from San Francisco State in 1984.

After taking the Medical College Admission Test four times, without special accommodations, he was able to obtain admission to the medical school at Davis. His admission was not based upon any special allowance for a disabled condition.

Wong started at the medical school in the fall of 1989. The medical school's program consists of a four-year curriculum. Typically, in the first two years, students take academic courses in basic sciences. In the third year, they complete six consecutive clinical "clerkships" in core areas of medical practice, and in the fourth year, they take a series of more specialized clerkships. Wong completed the first two years of the medical school program, the academic courses, on a normal schedule, with a grade average slightly above a "B." He had also passed the required national board examination immediately following the second year of school. Wong did not request or receive the benefit of any special accommodations

during the first two years of medical school or in taking the national board exam. Through this point, he had not identified himself to the medical school as being "learning disabled" or in need of accommodations.

When the program moved to the clinical clerkships in the third year, however, Wong's performance deteriorated substantially. He received a failing grade in his first clerkship and withdrew from his second after his midterm evaluation showed significant problems.[2]

Soon thereafter, his academic difficulties were compounded by a serious family problem: Wong's father was diagnosed with lung cancer. The school granted Wong's request to take time off to be with his father. Wong used part of that time to do reading in preparation for upcoming clerkships, and after he returned to school, he passed three clerkships. Unfortunately, his problems did not end at that point. Ultimately Wong was diagnosed by the University's Disability Resource Center ("DRC") as having a learning impairment that limited his ability to process and communicate information.[3] Based on the recommendation of the DRC, Wong requested extra time to read and prepare for his clerkships. When able to take several weeks off before a rotation in order to read in advance and prepare for it, Wong completed clerkships with passing grades and generally positive evaluations. There came a point, however, when Wong's request for another eight-week reading period before his next clerkship, in Pediatrics, was denied. A school official later gave a number of reasons for denying Wong's request, including that it was "unreason-

---

[2]Wong's grades were based on oral and written exams as well as on evaluations of his interactions with patients in the clinical setting.

[3]DRC doctors concluded that Wong had a disability that affects the way he processes written and verbal information and expresses himself verbally. While he was not given a more formal diagnosis of his learning impairment, Dr. Margaret Steward, a psychologist and Medical School faculty member, met with Wong to determine what accommodations would help him complete his medical education successfully.

able, unfair, and contrary to the purposes of the curriculum." Although Wong passed the written and oral exams for his Pediatric rotation, his ward performance was deemed unsatisfactory and he received a failing grade. After the relevant school committees concluded that Wong was not qualified to meet the school's academic standards, he was dismissed from the medical school in May 1995.

Wong filed a complaint in district court, alleging that the University violated his rights under the ADA by failing to accommodate his learning disability. The district court subsequently granted summary judgment for the University on two grounds: (1) that the accommodation sought by Wong was unreasonable, and (2) that the appellant was not "otherwise qualified" to continue his medical studies because he could not perform the tasks required by a doctor. Wong appealed. Our court reversed the district court's judgment and remanded for further proceedings on the ground that Wong had raised triable issues of fact. *Wong I*, 192 F.3d at 826.

In *Wong I* we held that in order to establish a prima facie case of disability discrimination, Wong was required to produce evidence that:

> (1) he is "disabled" as the Acts define that term; (2) he is qualified to remain a student at the School of Medicine, meaning that he can meet the essential eligibility requirements of the school with or without reasonable accommodation; (3) he "was dismissed solely because of [his] disability;" and (4) the school "receives federal financial assistance (for the Rehabilitation Act claim) or is a public entity (for the ADA claim)."

*Id.* at 816 (internal footnote omitted) (applying the factors set out in *Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 (9th Cir. 1999)). We noted that "[f]or summary judgment purposes, the University concedes that Wong has

met the first and last elements of this test." *Id*. The dispute then focused on the second element: whether Wong was "otherwise qualified" to satisfy the academic standards of the Medical School, with or without reasonable accommodation.

In this appeal, however, the University no longer concedes the first element, that Wong was disabled under the Acts. That is, instead, the primary focus of this appeal. On remand, the district court granted another motion for summary judgment brought by the University, this time based on Wong's inability to establish a disability.

That motion for summary judgment was filed by the University after cut-off dates established by the district court for identification of expert witnesses and for discovery. After a status conference held on March 13, 2000, the court issued an order which set the close of discovery on August 13, 2000. The order stated that counsel was required to disclose the names of any experts they proposed to offer at trial "not later than forty-five (45) days before the close of discovery," which was June 29, 2000. The order also set the final pretrial conference for February 12, 2001, and scheduled trial to start on May 15, 2001.

The University's motion for summary judgment was filed on September 1, 2000, about three weeks after the discovery cut-off date, about two months after the deadline for identifying expert witnesses, and about eight and one-half months before the scheduled trial date. It argued that Wong was not disabled within the meaning of the ADA. To support this contention, the University relied on its identified expert, Dr. Mark Lipian, who opined, among other things, that Wong was able to learn and work with greater facility than the average person.

Wong's attorneys concluded that they would need additional expert testimony to rebut Dr. Lipian's opinion. One of Wong's previously identified experts, Dr. Kay Runyan, gave

Wong a number of additional tests to support an opinion which was subsequently expressed in her declaration in opposition to the University's motion for summary judgment. She administered those tests with the help of an expert Wong had not previously retained or identified, Dr. Bianca Hirsch. Wong also retained Thomas Yankowski, a vocational counselor, to rebut Dr. Lipian's contention that Wong was not substantially limited insofar as his ability to work.

Wong filed his opposition to the University's motion for summary judgment on September 18, 2000, relying in large part on the work of these previously undisclosed experts. Two days later, Wong submitted a Supplemental Disclosure of Expert Witnesses, stating that he did not disclose these experts prior to his response to the University's summary judgment motion because he had not anticipated the University's challenge to his disabled status.

The University challenged Wong's identification of additional expert witnesses after the expert identification deadline and the discovery cut-off date. That challenge was presented to the district court in the context of the University's motion for summary judgment, with the University arguing that the court should not consider testimony by witnesses who had not been timely identified.

The district court agreed with the University on both subjects. On the challenge to Wong's additional expert witnesses, the court excluded expert opinions and other evidence from Dr. Hirsch and Mr. Yankowski. The court also limited Dr. Runyan's expert testimony to those opinions which were not based upon the testing conducted by Dr. Hirsch.

In the same order, filed January 11, 2001, the district court granted the University's motion for summary judgment. The court concluded that there was not a genuine issue of material fact as to whether Wong was "substantially limited [in] the

major life activities of learning, reading and working under 42 U.S.C. § 12102(A)."

As to the first two activities, the court concluded "that the record, taken as a whole, could not lead a rational trier of fact to find that plaintiff is substantially limited in the major life activities of learning and reading. *See Price v. National Bd. of Medical Examiners*, 966 F. Supp. 419 (S.D.W.Va. 1997) (finding that plaintiffs were not disabled under the ADA because they were able to learn as well or better than the average person in the general population)." Wong's prior academic success, which won him admission to medical school and which continued through the first two years of medical school, was viewed as fatally inconsistent with his claim to be disabled: "Given his previous academic success the issue translates to whether he can demonstrate that most people, or the average person, would not have difficulty with the third and fourth years of medical school." Having so defined the question, the district court concluded that Wong did not make a sufficient showing that he was "disabled" as to learning and reading.

Regarding the major life activity of working, the district court concluded that Wong "will only be precluded from jobs that require very specific and detailed deductive reasoning in an information-intense, rapid-flux, time-pressured or stressful environment." That assessment, the district court concluded, did not establish that he would be foreclosed from a broad range of jobs. "Given his academic achievements, however, and his intellectual skills, Mr. Wong has an enormous range of professional positions and occupations in which it is apparent that he could engage in successfully." Thus, the court held that Wong had failed to demonstrate that he was substantially limited as to working.

Wong contends that the district court erred in (1) excluding the key expert witnesses that he argues could have established his disabled status, and (2) holding that he did not raise a gen-

uine issue of material fact as to his disabled status under the Acts. We examine each contention in turn.

## II.  DISCUSSION

### A.   Exclusion of Supplemental Expert Testimony

Rulings regarding evidence made in the context of summary judgment are reviewed for an abuse of discretion. *Domingo v. T.K.*, 289 F.3d 600, 605 (9th Cir. 2002) (noting limited appellate review "even when the rulings determine the outcome of a motion for summary judgment"). The imposition of discovery sanctions are reviewed for an abuse of discretion. *Yeti by Molly, Ltd. v. Deckers Outdoor Corp.*, 259 F.3d 1101, 1105 (9th Cir. 2001).

**[1]** The abuse of discretion standard is deferential, and properly so, since the district court needs the authority to manage the cases before it efficiently and effectively. In these days of heavy caseloads, trial courts in both the federal and state systems routinely set schedules and establish deadlines to foster the efficient treatment and resolution of cases. Those efforts will be successful only if the deadlines are taken seriously by the parties, and the best way to encourage that is to enforce the deadlines. Parties must understand that they will pay a price for failure to comply strictly with scheduling and other orders, and that failure to do so may properly support severe sanctions and exclusions of evidence. The Federal Rules of Civil Procedure explicitly authorize the establishment of schedules and deadlines, in Rule 16(b), and the enforcement of those schedules by the imposition of sanctions, in Rule 16(f). As we observed in *Johnson v. Mammoth Recreations, Inc.*, 975 F.2d 604, 611 (9th Cir. 1992):

> As the torrent of civil and criminal cases unleashed in recent years has threatened to inundate the federal courts, deliverance has been sought in the use of cal-

endar management techniques. Rule 16 is an important component of those techniques.

The March 15, 2000 pretrial order at issue here was clear in advising the parties, among other things, that an expert witness not identified by the deadline would not be permitted to testify, and that an expert would not be permitted to testify as to "any information gathered or evaluated, or opinion formed, after deposition taken subsequent to designation."

Deadlines must not be enforced mindlessly, of course. Sometimes there may be good reason to permit an identification of additional witnesses after the established deadline. The pretrial order at issue here took that into account and itself established the standard for seeking relief from the order. It stated that no expert witness not timely disclosed would be permitted to testify "unless the party offering the witness demonstrates: (a) that the necessity of the witness could not have been reasonably anticipated at the time the lists were exchanged; (b) the court and opposing counsel were promptly notified upon discovery of the witness; and (c) that the witness was promptly proffered for deposition."

Wong's additional expert witnesses were promptly identified and offered to the University not long after the filing of the University's motion for summary judgment, so factors (b) and (c) were likely satisfied. The district court concluded, however, that Wong failed to satisfy factor (a). That conclusion does not represent an abuse of discretion.

Wong argues that he could not reasonably have anticipated the need for the additional witnesses as of the date set by the pretrial order as the deadline for both parties to identify expert witnesses, because he did not know that the University was disputing that he was "disabled" under the Acts. He notes that it was the University itself which diagnosed his learning disability in the first place, and, further, that the University did

not dispute that element of his case at the time of its first motion for summary judgment.

The diagnosis that Wong had a learning disability did not constitute a legal opinion or a concession that Wong was "disabled" under the meaning of the Acts, however. It is plain that having an impairment does not necessarily mean that a person is "disabled" for purposes of the Acts. *Toyota*, 534 U.S. at 195.

Nor does a decision by a defendant not to contest one element of a plaintiff's claim when bringing a motion for summary judgment mean or even imply that the given element will be conceded at the time of trial. There is nothing unusual about a defendant concentrating on limited aspects of a case in a motion for summary judgment, without waiving its right to contest other elements later, if the motion does not end the case. As we explicitly noted in *Wong I*, one of the elements Wong had to prove was that he was " 'disabled' as the Acts define that term." 192 F.3d at 816. At that time, the issue of whether Wong was disabled under the Acts was not in dispute, because the University had conceded that element "for summary judgment purposes." *Id*. But nothing required the University to concede that element for trial. A decision not to contest one essential element when moving for summary judgment based on a different essential element does not constitute a permanent waiver by the movant on the issue in question.

[2] After *Wong I*, the University put Wong on some measure of notice that his disabled status would be challenged. In its status conference statement, filed with the district court on March 6, 2000, the University stated that "[r]ecent United States Supreme Court cases have more clearly defined what constitutes a disability . . . such that defendant now believes that an examination of the plaintiff is necessary and appropriate in order to address the issue of whether plaintiff's condition can be held to be a disability under the relevant statutes."

The same filing announced that the University anticipated bringing a further motion for summary judgment. It does not appear that the University subsequently followed up with a specific request for an examination of plaintiff, but Wong points to no other statement or action by the University subsequent to that time which justified his professed belief that the University would not contest his condition as "disabled" under the Acts. Wong may have hoped that he would not be challenged on that element, but that is not nearly enough to support the proposition that he could not have reasonably anticipated the need to prove that element at trial. *Wong I* clearly set out four elements Wong would have to prove, and this was one of them. It was not unfair for the district court to expect him to prepare to do so, and to identify the witnesses he needed for that purpose, on a timely basis.

Moreover, as the district court observed in its order excluding Wong's late-identified witnesses, "if plaintiff was in doubt he could have resolved the issue with contention interrogatories; he did not do so." Wong has not offered a response on appeal, let alone provided an explanation for that failure. Similarly, the subject could have been covered by discovery into the opinions held by Dr. Lipian, the expert witness relied upon by the University in its motion for summary judgment. The Defendant's Disclosure of Expert Witnesses timely identified Dr. Lipian and described his anticipated testimony as including "the nature and extent of any learning disabilities the plaintiff had or has." Wong could have taken his deposition or propounded interrogatories to ascertain his opinions, including the opinions subsequently relied upon by the University in its summary judgment motion. Wong has not contended that Dr. Lipian did not properly respond to any such inquiries. If Wong was caught by surprise, it was not the University's fault. Under those circumstances, we cannot say that the district court abused its discretion in concluding that Wong did not satisfy the requirement for adding expert witnesses after the disclosure deadline: that it was not the case

that "the necessity of the witness could not have been reasonably anticipated at the time the lists were exchanged."

**[3]** Wong also argues that the district court's denial of his request to supplement his list of expert witnesses violated Fed. R. Civ. P. 37(c)(1). That rule states in relevant part:

> A party that without substantial justification fails to disclose information required by Rule 26(a) or 26(e)(1), or to amend a prior response to discovery as required by Rule 26(e)(2), is not, unless such failure is harmless, permitted to use as evidence at a trial, at a hearing, or on a motion any witness or information not so disclosed.

The rule excludes evidence from an untimely disclosed witness unless "the parties' failure to disclose the required information is substantially justified or harmless." *Yeti by Molly*, 259 F.3d at 1106.

**[4]** Wong argues, in effect, that he satisfied this test under Rule 37 for permitting testimony from a late-disclosed witness, because the late disclosure was either substantially justified, harmless, or both. We disagree.

Wong's failure to identify necessary witnesses on a more timely basis was, in the eyes of the district court, and in the words of Rule 37, "without substantial justification," for the reasons discussed above. Nor, it may be inferred, did the district court believe that the tardy identification was harmless, even though the ultimate trial date was still some months away. The same status conference order which set the deadline for expert identification and the completion of discovery also set a deadline for resolving pretrial motions, such as the University's motion for summary judgment. In this instance, it appears that the University filed its motion about as late as it could while still complying with the schedule set by the court. If Wong had been permitted to disregard the deadline

for identifying expert witnesses, the rest of the schedule laid out by the court months in advance, and understood by the parties, would have to have been altered as well. Disruption to the schedule of the court and other parties in that manner is not harmless. Courts set such schedules to permit the court and the parties to deal with cases in a thorough and orderly manner, and they must be allowed to enforce them, unless there are good reasons not to. The district court did not abuse its discretion here in refusing to permit Wong to supplement his disclosure with the additional expert witnesses and in barring testimony by and relying upon those witnesses.

B.　"Disability" under the Acts

**[5]** The ADA prohibits discrimination by public entities against qualified individuals with a disability. 42 U.S.C. §§ 12131-12132. The Rehabilitation Act similarly provides that "no otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving federal financial assistance." 29 U.S.C. § 794(a). The University is a public entity subject to these provisions.

The key substantive issue in this case — the issue on which the district court granted summary judgment to the University — is whether Wong fell within the definition of "disabled" under the Acts. If the district court was correct in concluding that Wong was not "disabled," then he did not qualify for the protections provided by the Acts, and summary judgment was properly granted against his legal claim. Wong's argument on appeal is that he demonstrated a genuine issue of material fact as to whether he was disabled under the Acts, even with his evidence limited by the district court's exclusion of untimely experts and opinions, discussed above. We review the district court's summary judgment de novo, and we view the facts in a light most favorable to Wong. *Fraser v. Goodale*, 342 F.3d

1032, 1037 (9th Cir. 2003), *cert. denied*, 124 S.Ct. 1663 (2004).

**[6]** The plaintiff bears the burden of proving that he or she is disabled within the meaning of the Acts. *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794 (9th Cir. 2001), *later supplemented at* 292 F.3d 1045 (9th Cir. 2002); *Wong I*, 192 F.3d at 816. The ADA defines a disability as:

> (A) a physical or mental impairment that substantially limits one or more of the major life activities of such individual;
>
> (B)    a record of such an impairment; or
>
> (C)    being regarded as having such an impairment.

42 U.S.C. § 12102(2).

The focus of our attention here is on subsection (A), which was the basis for the summary judgment entered by the district court and the subject of Wong's argument on appeal.[4] The consideration of whether a given condition constitutes a disability under subsection (A) involves three inquiries: (1) whether Wong's condition is a physical or mental impairment, (2) whether the life activity as to which Wong alleges he is limited is a *major* life activity, and (3) whether the impairment *substantially limits* the identified major life activity. *See Bragdon v. Abbott*, 524 U.S. 624, 631 (1998); *Fraser*, 342 F.3d at 1038.

For current purposes, there is no dispute as to the first question, whether Wong suffers from an impairment. The University's Disability Resource Center diagnosed Wong to have a learning disability or impairment that limited his ability to

---

[4]Wong does not argue on appeal that he separately qualifies under subsections (B) or (C).

process and communicate information. At a minimum that is sufficient to create a genuine issue of material fact as to whether he suffers from an impairment. The district court did not base its summary judgment on a conclusion to the contrary, and the University does not argue that point on appeal.

Nor is there a serious controversy as to whether the limitations alleged by Wong involved *major* life activities. Wong contends that he was substantially limited in learning, reading, and working. Under the circumstances, we may assume that each of those activities qualifies as a "major life activity" for determining whether a person is disabled under the Acts.[5]

[7] The real dispute here is over the third inquiry: whether Wong offered sufficient evidence that his impairment *substantially limited* him in a major life activity. The district court concluded that he had not. We agree.

---

[5]We have previously described "major life activities" as including "caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." *Fraser v. Goodale*, 342 F.3d 1032, 1038 (9th Cir. 2003); *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794 (9th Cir. 2001) ("working"); *Vinson v. Thomas*, 288 F.3d 1145, 1153 (9th Cir. 2002), *cert. denied*, 537 U.S. 1104 (2003) ("learning"). We have not previously discussed the activity of "reading," but other courts have treated it as a major life activity. *See, e.g., Bartlett v. New York State Bd. of Law Examiners*, 226 F.3d 69, 80 (2d Cir. 2000); *Gonzales v. National Bd. of Medical Examiners*, 225 F.3d 620, 626 (6th Cir. 2000). The Supreme Court in both *Toyota*, 534 U.S. at 200, and in *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 492 (1999), expressed some doubt as to the inclusion of "working" but found it unnecessary to decide the issue in those cases. Similarly, in this case it is not necessary for us to consider whether reading is a major life activity, or whether there is room to dispute the characterization of working or learning as major life activities under our caselaw. The district court did not base its summary judgment on a conclusion that any of these activities was not a major life activity for the purpose of defining "disability" under the Acts. Though it noted the potential for challenging the categories of reading and working, the University has not actually argued that these activities do not qualify as major life activities. Our resolution of this case on other grounds makes it unnecessary for us to devote further attention to that question.

**[8]** As noted at the outset of this opinion, we are pointed to that conclusion by the Supreme Court's unanimous decision in *Toyota Motor Manufacturing Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002). The Court stated that to "qualify as disabled, a claimant must . . . show that the limitation on the major life activity is 'substantial.' " *Id.* at 195 (brackets omitted). It observed that the word " '[s]ubstantially' in the phrase 'substantially limits' suggests 'considerable' or 'to a large degree.' . . . The word 'substantial' thus clearly precludes impairments that interfere in only a minor way . . . from qualifying as disabilities." *Id*. at 197. Similarly, it held that the word " '[m]ajor' in the phrase 'major life activities' means important . . . . 'Major life activities' thus refers to those activities that are of central importance to daily life." *Id*. And, it emphasized that "these terms need to be interpreted *strictly* to create a *demanding standard* for qualifying as disabled." *Id*. (Emphasis added.)

The facts of the *Toyota* case illustrate the Court's interpretation of the Acts. The plaintiff in that case suffered from carpal tunnel syndrome and tendinitis, which limited her ability to lift weight and to engage in repetitive arm movements. She sued her former employer for violation of the ADA, alleging that it failed to reasonably accommodate her disability. The district court granted summary judgment to the employer, finding that plaintiff was not disabled. The Sixth Circuit reversed and reinstated her claim, holding that she was disabled in the ability to perform manual tasks, because her ailments prevented her from doing tasks associated with certain types of jobs, including her previous position on an automobile manufacturing assembly line.

The Supreme Court overturned the decision of the Sixth Circuit, however, holding that the court of appeals had erred by focusing on the manual tasks associated with plaintiff's job. *Id.* at 200. The Court elaborated: "When addressing the major life activity of performing manual tasks, the central inquiry must be whether the claimant is unable to perform the

variety of tasks central to most people's daily lives, not whether the claimant is unable to perform the tasks associated with her specific job." *Id.* at 200-01. It went on to note that "the manual tasks unique to any particular job are not necessarily important parts of most people's lives." *Id.* at 201. The manual tasks of central importance to most people's daily lives were described as things like doing household chores, bathing, and brushing teeth, and those activities, according to the Court, should have been considered in determining whether the claimant was "disabled" under the Acts, by reason of being substantially limited in her ability to perform manual tasks. *Id.* at 201-02.

Our court interpreted and applied *Toyota* in the context of a different major life activity in *EEOC v. United Parcel Service, Inc.*, 306 F.3d 794 (9th Cir. 2002). In that case, employees of UPS with monocular vision who wanted to drive package vans but were not permitted to do so under the company's vision protocols brought a discrimination action under the ADA. At issue was the major life activity of "seeing," and specifically the question of whether the plaintiffs' impairment constituted a substantial limitation on seeing such that they were "disabled" under the ADA. We concluded that:

> [F]or a monocular individual to show that his impairment is a disability, *the impairment must prevent or severely restrict use of his eyesight compared with how unimpaired individuals normally use their eyesight in daily life* . . . . [S]ome visual impairment does not necessarily mean that the individual is substantially limited in seeing overall; put differently, it does not follow that seeing as a whole is substantially limited just because the individual has a deficiency in some aspect of vision. *The critical inquiry is whether seeing as a whole is substantially limited for purposes of daily living.*

*Id.* at 802-03. (Emphasis added).

The question for us, therefore, is whether Wong presented sufficient evidence to demonstrate that he was substantially limited in the specified major life activities for purposes of daily living, or as compared to what is important in the daily life of most people. He did not carry that burden.

[9] Regarding the activity of learning, Wong's claim to be "disabled" was contradicted by his ability to achieve academic success, and to do so without special accommodations. Most notably, Wong completed the first two years of the medical school program, the academic courses, on a normal schedule, with a grade point average slightly above a "B," and he passed the required national board examination at that point, both without the benefit of any special accommodations. That is not to say that a successful student by definition cannot qualify as "disabled" under the Acts. A blind student is properly considered to be disabled, because of the limitation on the major life activity of seeing, even if she graduates at the top of her class. Nor do we say that a successful student cannot prove "disability" based on a learning impairment. A learning-impaired student may properly be considered to be disabled if he could not have achieved success without special accommodations. But a student cannot successfully claim to be disabled based on being substantially limited in his ability to "learn" if he has not, in fact, been substantially limited, as that term is used in the Acts.

[10] The relevant question for determining whether Wong is "disabled" under the Acts was not whether he might be able to prove to a trier of fact that his learning impairment makes it impossible for him to keep up with a rigorous medical school curriculum. It was whether his impairment substantially limited his ability to learn as a whole, for purposes of daily living, as compared to most people. The level of academic success Wong achieved during the first two years of medical school, without any special accommodation provided to him by the school, made that proposition implausible. His record was to the contrary. Because the factual context made

implausible his contention that he was disabled in the activity of "learning" as compared to most people, he was required to "come forward with more persuasive evidence than otherwise would be necessary to show that there is a genuine issue for trial." *Blue Ridge Insurance Co. v. Stanewich*, 142 F.3d 1145, 1149 (9th Cir. 1998) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)). He did not present sufficient evidence in support of his contention to establish a triable issue of fact.[6]

As for the activity of reading, Wong's contention was not that he could not read, but that, as a result of his learning disability, he read very slowly and often had to re-read material several times. He cited evidence, for instance, that his reading comprehension scores, when allowed to read without time limits, were at the 99.5 percentile, but *under time constraints* he read at the eighth grade level.[7] In essence, it was argued

---

[6]The term "learning disability" is commonly used, and it is used by the dissent. In the current context that term can be misleading, however, for it is clear that a person who has a "learning disability" is not necessarily "disabled" under the Acts. The Acts use the term in a narrower fashion, to cover only those persons who have an impairment that substantially limits one of the major life activities. As a unanimous Supreme Court made explicit in *Toyota*, 534 U.S. at 195, having an impairment does not necessarily mean that a person is "disabled" for purposes of the Acts. The Acts establish a "demanding standard." *Id.* at 197. To be "disabled" under the Acts, a person has to be substantially limited in a major life activity, and that is measured by "most people's daily lives," not unique needs of a particular position. *Id.* at 200-01. Although he may have a learning disability, Wong is not substantially limited in the life activity of "learning" as compared to most people. The law compels accommodations for someone who is "disabled" as that term is used in the Acts, but not for everyone who may have a condition described as a "learning disability."

[7]At least some of the evidence cited by Wong in his briefs was part of the expert evidence excluded by the district court due to untimely identification, as discussed above. Because we have affirmed that exclusion, that evidence should properly not be considered in support of Wong's challenge to the summary judgment entered by the district court. Unfortunately, it is not entirely clear, notably with regard to the evidence

that Wong read slowly, especially when compared to his own reading comprehension ability without time limits, or to others in his academic peer group. He did not, however, present evidence to the district court or argue to us that he was substantially limited in his ability to read for purposes of daily living, or as compared to what is important in the daily life of most people. That is the appropriate standard. In *Toyota,* the Court said that the ability to perform manual tasks should be evaluated not by what claimant's job might require, but by claimant's ability to perform household chores, bathe, and brush teeth. 534 U.S. at 201-02. In *EEOC v. United Parcel Service*, we referred to the ability to use eyesight in such daily life activities as driving, reading, using tools, and playing sports. 306 F.3d at 803. In this case, Wong has not established that he was unable to read newspapers, government forms, street signs, or the like. Although his academic achievement is not directly inconsistent with the contention that he is substantially limited in reading, as it was with the claim based on "learning," the relationship between reading and academic success is sufficiently close to make that argument a difficult one to maintain. We agree with the district court that he did not present sufficient evidence to establish a triable issue of fact on that issue.

Wong's argument that he was substantially limited in the major life activity of working depended upon the testimony of Mr. Yankowski, one of the experts excluded by the district

---

attributed to Dr. Runyan, what evidence cited in those briefs should be considered at this point. Some of Dr. Runyan's opinions were excluded by the district court because they were based on the testing done by Dr. Hirsch after the expert witness identification and discovery cut-off dates. In particular, the specific opinions described here appear to have been based on those tests. We cite these particular opinions for ease of reference, for they seem to express in the clearest terms the basis for Wong's claim to be disabled in the life activity of reading. In doing so, we do not hold that this evidence should have been accepted or recognized by the district court.

court due to untimely identification. Because we have concluded that the exclusion was not an abuse of discretion, this argument necessarily fails, as well.

## III.  CONCLUSION

[11] We therefore affirm the judgment of the district court. We admire Wong's determination and his efforts to overcome his impairment, and we can understand his disappointment at not being able to achieve this ambition. As the Supreme Court held in *Toyota*, however, "[m]erely having an impairment does not make one disabled for purposes of the ADA." 534 U.S. at 195. By the demanding standards of the Acts, Wong is not substantially limited in a major life activity, so he does not qualify for the special protections the Acts provide for someone who is "disabled."

**AFFIRMED.**

---

THOMAS, Circuit Judge, dissenting:

One of the central purposes of Title II of the Americans with Disabilities Act is to provide equal opportunity for those individuals who are qualified to receive government services but cannot complete the program requirements without a reasonable accommodation of their disability. Unfortunately, the majority opinion turns this idea on its head by holding that, as a matter of law, academic success definitively disproves the existence of a learning disability. This interpretation places individuals with disabilities in a classic *Catch-22* situation. In order to receive an accommodation, the disabled person must show that he or she can satisfy the program's minimum eligibility requirements. However, under the majority theory, if the student meets those prerequisites, then the student cannot receive an accommodation because establishing qualification proves the student isn't disabled. Not only

does this interpretation evert the ADA's underlying theory, but it is antithetical to ADA's requirement of individualized assessment of disability.

Therefore, I must respectfully dissent.

I

The elements of an action under the Rehabilitation Act and Title II of the ADA are well established. As we held in the first iteration of this case:

> To establish a prima facie case of discrimination based upon his disability in violation of the Acts, Wong must produce evidence that: (1) he is "disabled" as the Acts define that term; (2) he is qualified to remain a student at the School of Medicine, meaning that he can meet the essential eligibility requirements of the school with or without reasonable accommodation; (3) he "was dismissed solely because of [his] disability;" and (4) the school "receives federal financial assistance (for the Rehabilitation Act claim) or is a public entity (for the ADA claim)." *Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1045 (9th Cir. 1999).

*Wong v. Regents of University of California*, 192 F.3d 807, 816 (9th Cir. 1999).

In the first phase of this case, the University conceded *arguendo* that Wong was disabled. Instead, the University focused on the second element and successfully argued to the district court that he could not meet the essential requirements of medical school even with an accommodation. However, we held that Wong had tendered sufficient evidence of his ability to meet the requirements if given an accommodation to survive summary judgment. Quite naturally, on remand Wong attempted to shore up his proof that he could satisfy perfor-

mance requirements if given a reasonable accommodation. The University filed a new motion for summary judgment, claiming that Wong was not disabled because he had shown academic success. The district court denied the motion, holding that there were genuine issues of material fact about that issue. However, some eight months later, the district court reversed course and granted summary judgment after oral argument on an *in limine* motion. The district court's essential reasoning was that Wong's record of academic success established that he did not have a qualifying disability. In short, Wong had proven himself out of a case in his attempts to show that he could succeed if given a chance. As the approving majority opinion puts it:

> Regarding the activity of learning, Wong's claim to be "disabled" is fatally contradicted by his ability to achieve academic success, without special accommodations. Most notably, Wong completed the first two years of the medical school program, the academic courses on a normal schedule, with a grade point average slightly above a "B," and he passed the required national board examination at that point, both without the benefit of any special accommodations. That is not to say that a successful student by definition cannot qualify as "disabled" under the Acts . . . . Nor do we say that a successful student cannot prove "disability" based on a learning impairment. A learning-impaired student may properly be considered to be disabled if he could not have achieved success without special accommodations . . . .
>
> . . . .
>
> . . . The level of success Wong has achieved without special accommodation precludes the possibility that he is disabled under the Acts based on a learning impairment.

If we were reviewing a jury verdict adverse to Wong, those sentiments might well be appropriate observations as a rationale for sustaining the jury verdict. However, this case comes to us on summary judgment where we do not weigh the preponderance of the evidence, but decide simply whether genuine issues of fact exist. In the summary judgment context — and particularly given the history of the case — a history of academic success alone cannot not justify the conclusion, as a matter of law, that a plaintiff is not disabled. To do so places the ADA plaintiff in an untenable situation where "[s]uccess negates the existence of the disability, whereas failure justifies dismissal for incompetency." Andrew Weiss, *Jumping to Conclusions in "Jumping the Queue,"* 51 Stan. L. Rev. 183, 205 (1998).

That is not the theory or the purpose of the ADA. The idea of the ADA is to afford equal opportunity to qualified individuals with disabilities; it is not to deny opportunity to the disabled solely because meeting the prerequisites of qualification demonstrates their abilities.

## II

To analyze the issue before us properly, we need to return to the fundamental question of what constitutes a disability under the ADA, and how that determination is made in a particular case. The ADA defines a disability as "a physical or mental impairment that substantially limits one or more of the major life activities of [an] individual." 42 U.S.C. § 12102(2)(A).

The first step is to determine whether the plaintiff has an ADA recognized "impairment." There is no doubt that learning disabilities fall within the ADA definition of impairment. Indeed, mental and physical impairments are defined to include "specific learning disabilities." 28 C.F.R. § 35.104. Federal law has long recognized learning disabilities as impairments. The Individuals with Disabilities Education Act,

20 U.S.C. §§ 1400-1409, specifically recognized those students with learning disabilities as qualifying for coverage.[1] 20 U.S.C. § 1401 (3). The Secretary of Education is empowered to make grants to colleges and universities to provide "professional development and technical assistance in order for students with learning disabilities to receive a quality postsecondary education." 20 U.S.C.A. § 1140a.

Although learning disabilities are unquestionably considered to be qualifying impairments, not all impairments are considered to be disabilities under the ADA. In order to be entitled to any kind of accommodation under the ADA, an individual must demonstrate that the qualifying impairment "substantially limits" a "major life activity." 42 U.S.C. § 12102(2)(A). It is uncontested that "learning" is considered a major life activity under the ADA. *See* 28 C.F.R. § 35.104 (2003) (defining "major life activity" to include learning). In the ADA context, "substantially limits" means "[s]ignificantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. § 1630.2(j)(1)(ii) (2003).

Thus, in our case, we start from the agreed premise that learning disabilities constitute qualifying ADA impairments, and that learning is a major life activity. The remaining disability issue is whether Wong's learning disability substan-

---

[1] The IDEA defines a learning disability as "a disorder in one or more of the basic psychological processes involved in understanding or in using language, spoken or written, which disorder may manifest itself in imperfect ability to listen, think, speak, read, write, spell, or do mathematical calculations. Such term includes such conditions as perceptual disabilities, brain injury, minimal brain dysfunction, dyslexia, and developmental aphasia. Such term does not include a learning problem that is primarily the result of visual, hearing or motor disabilities, of mental retardation, of emotional disturbance, or of environmental, cultural, or economic disadvantage." 20 U.S.C. § 1401 (26).

tially limits his ability to learn. Accordingly, to survive summary judgment on the question of disability, Wong was required to tender sufficient evidence to demonstrate that a genuine issue of material fact existed as to whether his learning disability significantly restricted the condition, manner or duration of his learning ability as compared to the average person in the general population. To that end, Wong tendered proof that:

- He was first identified as having learning disabilities while in kindergarten and required special tutoring;

- In middle school, he was assigned to a special class for assisted learning;

- During high school, junior college, and San Francisco State University, he spent all of his time outside school reading in order to keep up, and regularly requested extra time on assignments and essay exams;

- The University's own Disability Resource Center diagnosed him as having a learning disability or impairment that limited his ability to process information;

- His reading comprehension scores were in the 99th percentile when he was allowed to read without time limits, but that under time constraints his scores dropped to the eighth grade level; and

- When Wong was accorded — at the suggestion of a Medical School's faculty member — an additional reading period prior to his clerkships in Medicine and Surgery, he passed both with generally positive evaluations and "B" grades.

In sum, Wong tendered evidence of a long history of diagnosed learning disability that significantly restricted his ability to learn in the same manner as the average population. This is sufficient evidence to survive summary judgment on the question of the existence of a disability, and that should be the end of the inquiry.

However, the apparent problem in this case is that Wong worked too hard and succeeded too well. As with many students with learning disabilities, Wong developed alternative strategies to compensate for his disability and received special assistance throughout his elementary, secondary, and undergraduate education. As the result of his diligence, coupled with accommodations, Wong achieved sufficient academic success to be admitted to medical school. Without accommodation, he was able to successfully complete his first two years. On this basis, the majority concludes, *as a matter of law*, that "a student cannot successfully claim to be disabled based on a limitation of his ability to 'learn' with such a record of achievement." Although evidence of past academic success is certainly relevant to an ultimate factual determination of whether Wong is disabled, it plainly does not entitle the University to judgment as a matter of law. If so, as a matter of law, no student admitted to medical school could ever be considered to have a learning disability because the very act of admission would definitively disprove it.

The ADA does not draw such bright lines. Its guiding principle is that a disability determination is an individualized inquiry. *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 199 (2002); *Thornton v. McClatchy Newspapers, Inc.*, 261 F.3d 789, 794 (9th Cir. 2001). Aside from those impairments that might constitute a *per se* ADA disability, *see Albertson's, Inc. v. Kirkingburg,* 527 U.S. 555, 566 (1999), a determination whether a plaintiff is disabled within the meaning of the ADA requires a sensitive, fact-based analysis, which includes the nature and severity of the impairment, 29 C.F.R. § 1630.2(j)(2)(i), and the effectiveness and burdens of

mitigating measures used by the plaintiff, *see Sutton v. United Air Lines*, 527 U.S. 471, 488 (1999), among other considerations. In an individualized disability assessment "[w]e do not decide whether every diabetic is disabled, and we do not decide whether every severely obese person is not disabled." *Fraser v. Goodale*, 342 F.3d 1032, 1039 (9th Cir. 2003). This admonition is particularly apt in the examination of learning disabilities: The diagnosis of the nature and severity of dyslexia, dyscalculia, aphasia, and attention deficient disorder is far more complex and less precise than, for example, the detection of a staphylococci infection. Disabilities covered by the ADA, and learning disabilities in particular, defy generalization and uniform treatment. Thus, in our context, it is just as inappropriate to decide that all persons of achievement are *per se* not disabled as it is to decide that all persons with learning disabilities are disabled within the meaning of the ADA. *See, e.g., Vinson v. Thomas*, 288 F.3d 1145, 1153-54 (9th Cir. 2002) (finding a genuine issue of material fact where a college student alleged that his dyslexia substantially impaired his ability to learn). In this case the holding that academic achievement precludes a disability finding is also belied by the subsequent events. Indeed, if our story had concluded at the end of Wong's second year in medical school, no suit would have ensued. However, Wong's performance in clinical clerkships was not stellar. He failed his first clerkship and withdrew from his second. Wong nonetheless believed that if given the accommodation of extra time to prepare for his clerkships, he could successfully complete them. And, when given extra preparation time, he successfully completed his clerkships. However, when denied extra preparation time, he did not succeed. Thus, even if we focus our inquiry on his academic record, the record is far from conclusive. But that is a matter for a trier of fact.

The majority's approach effectively bars the entire class of learning disabled students from receiving ADA accommodations in graduate school. This plainly contradicts the required individualized assessment of disability. The grant of summary

judgment based on academic achievement as a matter of law cannot be reconciled with the ADA, Supreme Court case law, or Ninth Circuit precedent.

For these reasons, I respectfully dissent.