Dissent by Judge CALLAHAN.
OPINION
W. FLETCHER, Circuit Judge:
We must decide whether, consistent with the Americans with Disabilities Act (“ADA”), an employer properly terminated an employee who had recurring interpersonal problems with his 'colleagues that were attributable to attention deficit hyperactivity disorder (“ADHD”). Plaintiff Matthew Weaving worked for the Hills-boro Police Department (“HPD”) in Oregon from 2006 to 2009. HPD terminated Weaving’s employment in 2009 following severe interpersonal problems between Weaving and other HPD employees. Weaving contends that these interpersonal problems resulted from his ADHD. After his discharge, Weaving brought suit under the ADA. He contended that he was disabled because his ADHD substantially limited his ability to engage in two major life activities: ■ working and interacting with others. He claimed that HPD had discharged him because of his disabilities in violation of the ADA.
The jury returned a general verdict for Weaving, finding that he was disabled and that the City of Hillsboro (“the City”) had discharged him because of his disability. The City moved for judgment as a matter of law. It also moved for a new trial on the ground of improper jury instructions. The district court denied both motions, and the City appealed.
We reverse. We hold as a matter of law that the jury could not have found that ADHD substantially limited Weaving’s ability to work or to interact with others within the meaning of the ADA.
I. Background
The evidence presented at trial showed the following. In 1973, Weaving, then six years old, was diagnosed with “hyperkinetic activity,” known today as ADHD. His pediatrician prescribed medication. Weaving stopped taking medication at age twelve because, as his mother explained to him, he seemed ■ to have outgrown the symptoms of ADHD. He continued, however, to experience interpersonal problems throughout childhood and adolescence.
Weaving joined the Beaverton Police Department (“BPD”) in Oregon as a police officer in July 1995. During the application process, he passed a battery of tests, including psychological and medical evaluations. Because he believed ADHD no longer affected him, Weaving did not disclose or discuss his childhood diagnosis and medication. Weaving’s evaluations during his employment at BPD described *1108 him as “[ajloof, abrasive, too outspoken at inappropriate times,” “forcefully outspoken,” “disgruntled,” and “intimidating,” but also stated that he “works well with co-workers” and was “friendly, helpful and hard working.” Some of his supervisors noted that he “[h]ad difficulty working in a team environment.”
In 2001, while employed by BPD, Weaving became a narcotics detective on an interagency team. He was removed from the team less than a year later because of “personality conflicts” with another officer. Weaving filed a grievance and was put back on the team in 2003. While still employed by BPD, due to ongoing difficulties with colleagues Weaving left the inter-agency narcotics team to join an FBI task force. Weaving later learned that an FBI agent had complained to BPD about “communication issues” with him. The agent had written a letter to the BPD Police Chief stating that Weaving was “[frequently critical and vocal about his fellow investigators” and that he had an “overly aggressive style.”
Weaving was hired by HPD in 2006. During the application process, Weaving disclosed what he described as the “intermittent interpersonal communication issues” he experienced at BPD. HPD offered Weaving provisional employment, contingent upon passing a psychological evaluation. Weaving disclosed his childhood history of ADHD but did not believe at that time that ADHD continued to affect him.
Weaving’s first-year evaluation at HPD was generally positive. His supervisor, Lt. Jim Kelly, praised his experience and knowledge. Lt. Kelly wrote that he had seen Weaving conduct all his investigations in a “thorough, professional, and conscientious manner.” He wrote that Weaving “maintains pos[i]tive and respectful relationships with his teammates, his supervisors, and the community.” Lt. Kelly noted that “[a] few members of the Department have the misconception that Weaving is arrogant,” but that neither he nor members of Weaving’s patrol team had found this to be the case.
Weaving applied for a promotion to sergeant in 2007. The application process included a “psychological leadership assessment,” conducted by an off-site psychologist. Weaving did not mention ADHD during the application process because he believed he had outgrown it. The psychologist provided a six-page report in which he described Weaving as having a profile similar to individuals who “tend to be dominant in interpersonal relationships.” He described Weaving as “socially interactive” and engaging in “cooperative and outgoing” relationships with others. He observed that Weaving “projects a comfortable social presence” and stated that Weaving “likely presents himself well in just about any type of social situation and is likely to participate with any social group.” He described Weaving as “poised in his presentation and articulate in answering the scenarios.”
Weaving was promoted to sergeant in April 2007. In his annual evaluation, covering the period from May 2007 through April 2008, Lt. Kelly wrote that Weaving’s interactions with the public were professional and that he displayed empathy toward members of the public. Lt. Kelly wrote that Weaving’s communication style (“[djirectness”) came across to officers as “arrogant” and inspired fear, but that he personally did not have difficulties with Weaving. Lt. Kelly wrote that Weaving was aware of his communication issues and seemed willing to try new approaches.
Weaving’s interpersonal difficulties continued after Lt. Kelly’s 2008 evaluation. One subordinate testified at trial that he found Weaving’s responses to his questions *1109 “demeaning.” Another subordinate testified that Weaving’s responses to questions were “intimidating,” making him “feel stupid and small.” In May 2008, a fellow sergeant wrote an email to Weaving and two other officers complaining about the number of “unapproved reports” that had been waiting for him when he arrived for his shift on Sunday morning, and questioning an earlier shift’s decision to tow two cars. Weaving replied in an email:
Allow me to respond to your email that by the way is a “PUBLIC RECORD”;
I’ll respond to the second part of your inquisitive email [the part about the two cars] with a metaphorical analogy. Envision a swimming pool with a deep end and a shallow end separated by a floating rope....
There are many more potential hazards in the deep end and a person would be foolish to venture there without the technical expertise, stamina and initiative to keep from drowning. There are countless people who are good swimmers but still remain in the shallow end for fear of the potential danger the deep end harbors. Still, there are others who negligently and recklessly venture to the deep end without any technical proficiency and tragically drown. My recommendation to you is that you remain in the shallow end where you can splash around with the kids.
What really upsets me about your inquiry is not the simple fact that you question my judgment and knowledge but the manner in which you have done so. If you have any desire to discuss this incident further or any other incident please- do not do so in a public record email, come and find me any day of the week! I’m easy to locate, I’m in the deep end so bring your water wings!
In addition, Weaving referred to some HPD officers in a derogatory fashion, calling them “salad eaters,” rather than “meat eaters” or “warriors,” to imply that the officers were weak. He also criticized the language skills of a newly hired Latino officer who did not speak English as his first language.
In March 2009, Weaving issued a several-page disciplinary letter to a subordinate who had driven a marked police vehicle through a surveillance area. At the time of the incident, Weaving had verbally rebuked the officer over the open radio. The officer believed the letter was a disproportionate response to what he had done. He filed a grievance against Weaving with the City Human Resources Department. On April 7, 2009, the City placed Weaving on paid administrative leave pending investigation of the grievance.
Weaving testified that, while he was on leave, it occurred to him that some of his interpersonal difficulties at HPD might have been due. to ADHD. He met with a mental health nurse practitioner who prescribed him a low dose of medication and referred him to Dr. Gary Monkarsh, a clinical psychologist. Dr. Monkarsh concluded that Weaving suffered from adult ADHD. Dr. Monkarsh testified at trial that people with ADHD “have a hard time understanding their emotions, the emotions of others, the ability to regulate one’s emotions and the emotions of others, the ability to empathize with others.” He also testified that someone with Weaving’s characteristics “could be an excellent police officer.”
On May 7, 2009, Dr. Monkarsh sent a letter to the HPD Police Chief stating that he had diagnosed Weaving as having ADHD. A day later, Weaving wrote to the City Human Resources director informing her of Dr. Monkarsh’s diagnosis and at *1110 taching his letter to the Police Chief. He wrote:
My Psychologist ... has advised me that he is confident that with sustained treatment I will eliminate communication issues that currently are being considered adverse to the work environment of the Hillsboro Police Department (HPD)....
During my three years of service with HPD I have been told multiple times by several ranking members that my experience, leadership and knowledge are a tremendous asset. I’m excited about transforming an identified weak area into an area of strength and becoming an even greater asset to the City of Hillsboro. I look forward to receiving the positive support from the City that other HPD employees, who are afflicted with a mental disorder or an addiction, receive.
Weaving requested “all reasonable accommodations,” including reinstatement to his position as an active-duty sergeant.
On June 16, 2009, Lt. Richard Goerling wrote a memorandum summarizing the findings of the investigation of the grievance against Weaving. The investigation, conducted while Weaving was on leave, included interviews of 28 HPD employees. Lt. Goerling concluded that Weaving had “creat[ed] and foster[ed] a hostile work environment for his subordinates and peers; in particular, he has been described in terms such as tyrannical, unapproachable, noncommunicative, belittling, demeaning, threatening, intimidating, arrogant and vindictive.” He wrote, “In the short time Weaving has been employed at HPD, he has demonstrated time and again unacceptable interpersonal communication that suggests he does not possess adequate emotional intelligence to successfully work in a team environment, much less lead a team of police officers.”
On Lt. Goerling’s recommendation, the City conducted an independent medical evaluation and evaluated Weaving’s fitness for duty. Two doctors found Weaving fit for duty despite his ADHD diagnosis. On November 24, 2009, the Deputy Chief of Police sent Weaving, through his attorney, a sixteen-page letter advising him of the City’s intention to terminate his employment “unless you persuade me otherwise.” The letter described in detail Weaving’s interpersonal problems and their effect on HPD. After a hearing, the City terminated Weaving’s employment effective December 11, 2009.
Weaving sued the City in federal district court under the ADA. He alleged that (1) the City fired him because he had an impairment that limited his ability to work or interact with others, and (2) the City fired him because it regarded him as disabled. The case was tried to a jury. The City moved for judgment as a matter of law at the close of Weaving’s case-in-ehief. The district court denied the motion. The City renewed its motion at the close of all evidence. The district court again denied the motion.
The district court instructed the jury that Weaving was disabled if he had a mental impairment that substantially limited one or more major life activities, including “interacting with others, working and communicating.” It also instructed the jury, over the City’s objection, that “[c]on-duct resulting from a disability is part of the disability and not a separate basis for termination.”
The jury returned a verdict for Weaving, finding him disabled under the ADA. It found that the City had terminated him because of his disability. The jury awarded Weaving $75,000 in damages. The district court awarded $232,143 in back pay, $330,807 in front pay, and $139,712 in attorney’s fees. The district court refused *1111 Weaving’s request for reinstatement because of “hostility and antagonism between” Weaving and HPD.
The City filed a renewed motion for judgment as matter of law based on insufficient evidence to support the verdict, as well as a motion for a new trial based on an allegedly erroneous jury instruction. The district court denied both motions. The City timely appealed.
We reverse the denial of the motion for judgment as a matter of law. We do not reach the denial of the motion for a new trial.
II. Standard of Review
We review de novo a denial of a motion for judgment as a matter of law to determine whether substantial evidence supported the prevailing party’s claims. Erickson v. Pierce Cnty., 960 F.2d 801, 804 (9th Cir.1992). “Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support a conclusion even if it is possible to draw two inconsistent conclusions from the evidence.” Landes Constr. Co. v. Royal Bank of Can., 833 F.2d 1365, 1371 (9th Cir.1987). “It is error to deny a judgment [as a matter of law] when it is clear that the evidence and its inferences cannot reasonably support a judgment in favor of the opposing party.” Erickson, 960 F.2d at 804.
III. Discussion
The ADA forbids discrimination against a “qualified individual on the basis of disability.” 42 U.S.C. § 12112(a). A disability is “a physical or mental impairment that substantially limits one or more major life activities of [the] individual [who claims the disability],” or “a record of such an impairment,” or “being regarded as having such an impairment.” Id. § 12102(1). The ADA provides a nonexhaustive list of “major life activities.” Such activities include “caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.” Id. § 12102(2)(A).
A 2008 amendment to the ADA provides, “The definition of disability in this chapter shall be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter.” Id. § 12102(4)(A). “The term ‘substantially limits’ shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008.” Id. § 12102(4)(B). Those findings and purposes specifically express Congress’s view that prior Supreme Court and lower court cases, as well as Equal Employment Opportunity Commission (“EEOC”) regulations, had given “substantially limits” an unduly narrow construction. ADA Amendments Act of 2008, § 2(a)(4)-(8), Pub.L. No. 110-325, 122 Stat. 3553, 3553. “An impairment that substantially limits one major life activity need not limit other major life activities in order to be considered a disability.” 42 U.S.C. § 12102(4)(C). According to post-2008 regulations promulgated by the EEOC,
An impairment is a disability ... if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population. An impairment need not prevent, or significantly or severely restrict, the individual from performing a major life activity in order to be considered substantially limiting.
29 C.F.R. § 1630.2(j)(l)(ii). Determining whether an impairment is substantially limiting “requires an individualized assessment.” Id. § 1630.2(j)(l)(iv).
*1112 Weaving contends that the evidence at trial shows that he is substantially limited in the major life activities of working and of interacting with others. We take these two activities in turn.
A. Working
The ADA specifically lists working as a major life activity. See 42 U.S.C. § 12102(2)(A). Under our pre-2008 case law, in order to show a substantial limitation on his ability to work, a plaintiff had to establish that his impairment precluded working not only at a particular job, but also a class of jobs or a broad range of jobs in various classes. See Sutton v. United Air Lines, Inc., 527 U.S. 471, 491, 119 S.Ct. 2139, 144 L.Ed.2d 450 (1999); Holihan v. Lucky Stores, Inc., 87 F.3d 362, 366 (9th Cir.1996). The plaintiff had to present specific evidence about relevant labor markets in order to avoid summary judgment on a claim that he was substantially limited in his ability to work. Thornton v. McClatchy Newspapers, Inc., 261 F.3d 789, 795 (9th Cir.2001); Thompson v. Holy Family Hosp., 121 F.3d 537, 540 (9th Cir.1997).
The 2008 amendments to the ADA relaxed the standard for determining whether a plaintiff is substantially limited in engaging in a major life activity, but Weaving cannot satisfy even the lower standard under current law. The record does not contain substantial evidence showing that Weaving was limited in his ability to work compared to “most people in the general population.” See 29 C.F.R. § 1630.2(j)(l)(ii). On the contrary, there is evidence showing that Weaving was in many respects a skilled police officer. Dr. Monkarsh and Weaving both testified that Weaving had developed compensatory mechanisms that helped him overcome ADHD’s impediments and succeed -in his career. Weaving’s supervisors recognized his knowledge and technical competence and selected him for high-level assignments. In 2007, before receiving any treatment for adult ADHD, he was promoted to sergeant. In 2009, a psychologist and a physician/psychiatrist both deemed Weaving fit for duty as a police officer.
The only evidence Weaving presents regarding ADHD’s effects on his ability to work pertains to his interpersonal problems. He contends in his brief that “[t]he impairment of the major life activity of ‘working’ was derivative and resulted from the impairments of the major life activities of communication and interaction with others.” We discuss in a moment the lack of evidence showing a substantial impairment of Weaving’s ability to interact with others. Given the absence of evidence that Weaving’s ADHD affected his ability to work, and in light of the strong evidence of Weaving’s technical competence as a police officer, a jury could not reasonably have concluded that Weaving’s ADHD substantially limited his ability to work.
B. Interacting with Others
Weaving also argues that he is disabled because his ADHD substantially limits his ability to interact with others. Unlike many of our sister circuits, we have specifically recognized interacting with others as a major life activity. Cf. Bodenstab v. Cnty. of Cook, 569 F.3d 651, 656 (7th Cir.2009) (assuming, without deciding, that interacting with others is a major life activity); Heisler v. Metro. Council, 339 F.3d 622, 628 (8th Cir.2003) (same); Steele v. Thiokol Corp., 241 F.3d 1248, 1255 (10th Cir.2001) (same); Soileau v. Guilford of Me., Inc., 105 F.3d 12, 15 (1st Cir.1997) (assuming, “dubitante, that a colorable claim may be made that ‘ability to get along with others’ is or may be ... a major life activity under the ADA”).
*1113 We wrote in McAlindin v. County of San Diego, 192 F.3d 1226 (9th Cir.1999), that “[b]ecause interacting with others is an essential, regular function, like walking and breathing, it easily falls within the definition of ‘major life activity.’ ” Id. at 1234. There was evidence in McAlin-din that the plaintiff suffered from panic attacks, “fear reaction[s],” and “communicative paralysis,” which caused him to stay at home for at least twenty hours per day. Id. at 1235. We held that this evidence was enough to defeat the defendant’s motion for summary judgment. Id. at 1235-36. However, we cautioned:
Recognizing interacting with others as a major life activity of course does not mean that any cantankerous person will be deemed substantially limited in a major life activity. Mere trouble getting along with coworkers is not sufficient to show a substantial limitation....
In addition, the limitation must be severe.... We hold that a plaintiff must show that his “relations with others were characterized on a regular basis by severe problems, for example, consistently high levels of hostility, social withdrawal, or failure to communicate when necessary.”
Id. at 1235. In Head v. Glacier Northwest, Inc., 413 F.3d 1053 (9th Cir.2005), we held that a plaintiff who “avoid[ed] crowds, stores, large family gatherings, and even doctor’s appointments,” and who did not leave the house for weeks after losing his job, had offered sufficient evidence of disability to survive summary judgment. Id. at 1060-61.
The evidence in this case differs starkly from that in McAlindin and Head. The plaintiffs in those cases were so severely impaired that they were essentially housebound. McAlindin’s doctor described him as “barely functional,” and there was evidence that he “suffered] from a total inability to communicate at times.” McAlindin, 192 F.3d at 1235. Head avoided contact with others, even members of his family, and had difficulty even carrying on conversations over the telephone. Head, 413 F.3d at 1061.
The evidence at trial showed that Weaving has experienced recurring interpersonal problems throughout his professional life. Those problems have had significant repercussions on his career as a police officer, resulting, most recently, in the termination of his employment with HPD. But Weaving’s interpersonal problems do not amount to a substantial impairment of his ability to interact with others within the meaning of the ADA. Weaving’s ADHD may well have limited his ability to get along with others. But that is not the same as a substantial limitation on the ability to interact with others. See McAlindin, 192 F.3d at 1235; see also Jacques v. DiMarzio, Inc., 386 F.3d 192, 203 (2d Cir.2004) (distinguishing “ ‘getting along with others’ (a normative or evaluative concept) and ‘interacting with others’ (which is essentially mechanical)”).
In contrast to the plaintiffs in McAlin-din and Head, Weaving was able to engage in normal social interactions. His interpersonal problems existed almost exclusively in his interactions with his peers and subordinates. He had little, if any, difficulty comporting himself appropriately with his supervisors. A case like Weaving’s is what we described in McAlindin as not giving rise to a disability claim. 192 F.3d at 1235; see also Weidow v. Scranton Sch. Dist., 460 Fed.Appx. 181, 185-86 (3d Cir.2012) (stating that, assuming that interacting with others was a major life activity, a plaintiff who failed to show that her condition caused her to have trouble getting along with people in general was not’disabled because she was not substantially limited in her ability to interact with *1114 others); Doebele v. Sprint/United Mgmt. Co., 342 F.3d 1117, 1131 (10th Cir.2003) (same); Steele, 241 F.3d at 1255 (same).
As we wrote in McAlindin, a “cantankerous person” who has “[m]ere trouble getting along with coworkers” is not disabled under the ADA. 192 F.3d at 1325; see also EEOC Enforcement Guidance on the Americans with Disabilities Act and Psychiatric Disabilities, U.S. Equal Employment Opportunity Commission (March 25, 1997), http://www.eeoc. gov/poliey/docs/psych.html (“Some unfriendliness with coworkers or a supervisor would not, standing alone, be sufficient to establish a substantial limitation in interacting with others.”). One who is able to communicate with others, though his communications may at times be offensive, “inappropriate, ineffective, or unsuccessful,” is not substantially limited in his ability to interact with others within the meaning of the ADA. Jacques, 386 F.3d at 203. To hold otherwise would be to expose to potential ADA liability employers who take adverse employment actions against ill-tempered employees who create a hostile workplace environment for their colleagues.
Conclusion
Based on the evidence presented in this case, no reasonable jury could have found Weaving disabled under the ADA. His ADHD did not substantially limit either his ability to work or to interact with others. The district court erred in denying the City’s motion for judgment as a matter of law.
REVERSED and REMANDED.