[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 20-12513

_____

D.C. Docket No. 7:17-cv-00854-RDP

MARTIN FORSYTH,

Plaintiff-Appellant,

versus

UNIVERSITY OF ALABAMA,
BOARD OF TRUSTEES,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Northern District of Alabama

_____

(September 8, 2021)

Before JILL PRYOR, LUCK, and BRASHER, Circuit Judges.

PER CURIAM:

Martin Forsyth appeals the district court's grant of summary judgment to the

University of Alabama on his employment discrimination claims brought under the

Rehabilitation Act. Forsyth alleged that the University fired him because of his mental impairment and asserted Rehabilitation Act claims under both a disparate treatment and a disparate impact theory. The district court held that Forsyth failed to meet his burden for either claim. We agree.

## I.    BACKGROUND

This case involves an employment dispute between an employee and a supervisor who did not get along. When Martin Forsyth first began working for the University of Alabama as a carpenter, he received positive performance reviews, including comments such as "works well with his co-workers … [and] has leadership qualities but[] is able to follow the lead man on their crew very well." Soon after, he was even promoted to a supervisory role. His direct supervisor thought Forsyth was "a natural leader and the one that people look to," and noted that Forsyth "ha[d] been in [the new] position for about six months and ha[d] proven that we made the best choice. His planning, leadership[,] and delegation ha[ve] been good."

But after several years, Neal DiChiara was hired as the new manager for building maintenance—a position above Forsyth's direct supervisor in the organizational hierarchy—and Forsyth began to have difficulty with DiChiara. The first episode occurred when Forsyth noticed asbestos during a job on campus and left—without telling his supervisors—to notify the University's Environmental Health and Safety Department. He then received a "corrective counseling," at least

in part because DiChiara felt like Forsyth was undermining his authority by going straight to EHS. Forsyth, his direct supervisor, and DiChiara met with human resources to discuss the dispute. At that meeting, Forsyth told DiChiara that "he didn't respect him, and he would never respect him."

In Forsyth's next evaluation, he received his first negative comment: "[Forsyth] can improve his attitude [and] outlook towards his job and others. Much of the past year was spent in conflict w[ith] management." About a month after receiving that evaluation, there was another incident. Management failed to inform the employees (including Forsyth) of a mandatory ethics training until four hours before it began. After getting permission from his direct supervisor to miss the meeting, Forsyth also asked for DiChiara's permission. That led to a contentious exchange that ended with raised voices and foul language. Human resources "determined that Mr. Forsyth was the instigator of the incident, and although Mr. DiChiara had cursed during the confrontation, he did not curse at Mr. Forsyth." DiChiara told human resources that "he wanted to fire [Forsyth] for arguing with him in front of a bunch of people." As a result of that incident, Forsyth received a second corrective counseling for being "argumentative, disrespectful, and insubordinate" and was suspended for three-and-a-half days without pay.

That year Forsyth received a "needs improvement" for "cooperation" in his annual performance evaluation. The evaluation comments suggested that Forsyth

"find ways to be more approachable." A little over a year later, there were allegations that Forsyth made an unkind comment about a co-worker. Because the situation was a he-said–she-said, no one was punished, but the incident was documented in Forsyth's personnel file. And just over a week later, DiChiara issued Forsyth a Performance Improvement Plan. According to DiChiara, he issued this PIP because in the previous three years, "[t]here [were] seven documented occasions … [where Forsyth's] attitude and/or working relationship with management and coworkers … need[ed] improvement." "The goal of the PIP was to increase [Forsyth's] productivity as a lead carpenter and increase his rapport with [his] co-workers." Forsyth's direct supervisor stated: "Certainly I just wanted to see improvement." Shortly afterwards, Forsyth filed an internal complaint alleging harassment.

Before completing the PIP, Forsyth received another corrective counseling for commenting to a co-worker that "[y]ou haven't learned yet that the University is going to do what benefits the University." Forsyth asserted that the corrective counseling was "yet another attempt at retaliation made by … DiChiara against me." The associate vice president for facilities and grounds (DiChiara's boss) met with Forsyth to discuss the incident. Because Forsyth "seemed … angry and frustrated," the associate vice president suggested that he talk with the University's Employee Assistance Program "about counseling, anger management, depression, or a whole array of things that could help him be more successful." Eventually, Forsyth

4

completed the PIP successfully, receiving a letter from DiChiara stating that "improvement had been made as a result of the plan."

A month after that review, Forsyth volunteered for an unpopular route and shift. The agreement was that he would work that route and shift until a new position opened, and a new person was hired. DiChiara acknowledged Forsyth's "improved disposition around the shop" and "complimented [Forsyth] on his attitude and told him how much [he] appreciated the way [Forsyth] was handling himself around the shop." After Forsyth worked on the unpopular route for almost two years, the University hired a new carpenter. Because of the new hire, Forsyth approached his direct supervisor about switching off the unpopular route and shift, but his direct supervisor refused to let him. A few weeks later, Forsyth was issued a final corrective counseling due to six minor infractions (one of which was asking his supervisor about switching routes and four of which occurred that same week). This counseling was essentially a final warning, and if Forsyth did not show improvement, "[d]ismissal [would] [b]e [r]ecommended." Forsyth said that the instances were misconstrued and taken out of context. He also asserted that "this personal battle" with DiChiara had been going on for five years.

Forsyth then sought counseling through the University's Employee Assistance Program because he was feeling "a lot of anxiety[] and … depression." Forsyth testified that his depression did not affect the physical aspect of his job, but

it did affect his interactions with others. Forsyth also testified that he told his direct supervisor and a few co-workers that he had started going to counseling at the EAP. Forsyth did not inform anyone else about his counseling or depression, and no one ever commented on it.

The following summer, Forsyth was helping with the "summer walkthrough," which is when the maintenance and custodial staff make the dorms ready for the fall. During that summer, an employee in the housing department discovered that a storage room in one of the dorms had been converted into a makeshift "breakroom" with a refrigerator, microwave, chairs, a table, groceries, newspapers, and shelves. When DiChiara reviewed surveillance footage from outside the room, it revealed that Forsyth and two coworkers had regularly used the room that summer. In fact, Forsyth was observed "not working for 85 minutes during the seven day period" that the surveillance video covered. Taking an unauthorized break is a violation of department policy and does not meet the University's Standards of Behavior.

When confronted about the makeshift breakroom, Forsyth lied, saying that he did not have a key. Forsyth and the two other employees seen entering and exiting the room denied taking unauthorized breaks. Forsyth claimed that the alleged unauthorized breaks were times when he was either making work-related phone

calls, waiting on plumbers, electricians, or other workers to complete their tasks before he could complete his work orders, or "formulat[ing] some kind of plan."

All three of the employees seen using the makeshift breakroom, including Forsyth, were fired. Eventually, Alabama's Department of Labor Board of Appeals accepted Forsyth's explanation, concluding that Forsyth was eligible for unemployment benefits because he had not taken unauthorized breaks. Instead, "the 'unauthorized breaks' w[ere] simply a result of their skill waiting on another skill to begin." Additionally, after Forsyth was fired, he was formally diagnosed with depression and prescribed medication.

Forsyth sued the University, bringing two claims under Section 504 of the Rehabilitation Act: one based on disparate treatment, alleging that the University fired him because of his disability, and the other based on disparate impact, alleging that the University's "evaluation and disciplinary system" screened him out because of his disability.

After discovery, the University moved for summary judgment, arguing that Forsyth had not presented evidence sufficient to support either claim. As to the disparate treatment claim, the University argued that Forsyth had not established that he had a disability and, even if he had, he had also not shown that the University had fired him "solely by reason of" that disability. As to the disparate impact claim, the University argued that such claims were not cognizable under Section 504 and that,

7

even if they were, Forsyth had not presented any statistical evidence showing that it had any policy or practice that had a disproportionate negative effect on disabled, as opposed to non-disabled, people. Forsyth opposed the motion. He argued that the University "regarded [him] as having … an impairment," which was one definition of "disability" under the statute. He did not dispute that the University had offered a legitimate, non-discriminatory reason for his termination, but he argued that that reason was pretextual. He also argued that his disparate impact claim should proceed to trial.

The district court granted the motion for summary judgment on both claims. It held that Forsyth had not established that the University had regarded him as impaired or that it had fired him "solely by reason of" his alleged disability. Alternatively, it held that even if Forsyth had met those elements and established a prima facie case of discrimination, the University had offered a legitimate, non-discriminatory reason for his termination, and Forsyth had not met his burden to show that it was pretextual. The district court also rejected Forsyth's disparate impact claim, holding that Section 504 did not allow such claims and, even if it did, Forsyth had failed to provide evidence of any policy or practice that impacted

disabled people more negatively than it impacted non-disabled people. Forsyth timely appealed.

## II.    STANDARD OF REVIEW

We review a district court's grant of summary judgment *de novo*. *Peppers v. Cobb Cnty.*, 835 F.3d 1289, 1295 (11th Cir. 2016). "When reviewing a grant of summary judgment, the court of appeals may affirm if there exists any adequate ground for doing so, regardless of whether it is the one on which the district court relied." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993). Under Federal Rule of Civil Procedure 56, summary judgment is proper if, viewing the evidence that the parties submitted in the light most favorable to the non-moving party, that evidence "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    DISCUSSION

The Rehabilitation Act generally prohibits programs and activities that receive federal funding "from discriminating in employment against otherwise qualified individuals with a disability." *See Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *see also Nat'l Ass'n of the Deaf v. Florida*, 980 F.3d 763, 774 (11th Cir. 2020). Forsyth brought two claims under Section 504 of the Rehabilitation Act: one for disparate treatment discrimination and one for disparate impact discrimination.

9

He argues that the district court should not have granted summary judgment on either. For the reasons below, we disagree.

## A. Disparate Treatment

Because Forsyth's disparate treatment claim rests on circumstantial evidence, we apply the "three-part burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 … (1973)." *Ctr. v. Sec'y, Dep't of Homeland Sec., Customs & Borders Prot. Agency*, 895 F.3d 1295, 1303 (11th Cir. 2018). Under that framework, the plaintiff must first "establish a prima facie case of discrimination ... [by] showing that (1) [he] had a disability; (2) [he] was otherwise qualified for the position; and (3) [he] was subjected to unlawful discrimination as the result of [his] disability." *Garrett v. Univ. of Ala. at Birmingham Bd. of Trs.*, 507 F.3d 1306, 1310 (11th Cir. 2007). If the plaintiff establishes a prima facie case, the "burden ... shift[s] to [the employer] to articulate a legitimate, nondiscriminatory reason for [the action]." *Cleveland v. Home Shopping Network, Inc.*, 369 F.3d 1189, 1193 (11th Cir. 2004). If the employer does so, the burden returns to the plaintiff to present "actual evidence" that the reason given is pretextual. *Ctr.*, 895 F.3d at 1303. We look first to whether Forsyth has established a prima facie case of discrimination.

Here, the parties dispute whether Forsyth has shown that he had a disability. The Rehabilitation Act defines the term "disability" as: "(A) a physical or mental impairment that substantially limits one or more major life activities of such

10

individual; … or (C) being regarded as having such an impairment." 42 U.S.C. § 12102(1); *see also* 29 C.F.R. § 1630.2(g)(1). At the district court, Forsyth argued that he was both "actually disabled" and "regarded as disabled." But before this Court, he has abandoned the first argument and argues only that the University regarded him as having an impairment.

A plaintiff is regarded as having an impairment if he is terminated "because of an actual or perceived physical or mental impairment" that is not "transitory and minor." 42 U.S.C. § 12102(3)(A)–(B). A "mental impairment" is "[a]ny mental or psychological disorder, such as an intellectual disability (formerly termed 'mental retardation'), organic brain syndrome, emotional or mental illness, and specific learning disabilities." 29 C.F.R. § 1630.2(h)(2). Under the "regarded as" theory, the perceived impairment need not "limit[] or [be] perceived to limit a major life activity" to be a disability, *see* 42 U.S.C. § 12102(3)(A); *Lewis v. City of Union City*, 934 F.3d 1169, 1181–82 (11th Cir. 2019). Importantly, what matters for the "regarded as" theory is whether the University perceived Forsyth as impaired, not whether he was actually impaired. *See Carruthers v. BSA Advert., Inc.*, 357 F.3d 1213, 1216 (11th Cir. 2004).

Forsyth argues that the University "regarded him as impaired in the ability to interact with others" and asserts that "[t]he inability to interact with others has been recognized as an impairment."

11

Even assuming that the inability to interact with others is itself a mental impairment—and not a symptom of a mental impairment—we have serious doubts that any reasonable juror could find that the University regarded Forsyth as *unable* to cooperate and interact appropriately with his co-workers and supervisors. Instead, the record supports an inference that the University believed Forsyth was *choosing* to behave inappropriately, not that he was *unable* to behave appropriately. That distinction matters because caselaw makes clear that "a 'cantankerous person' who has '[m]ere trouble getting along with coworkers' is not disabled under the ADA." *Weaving v. City of Hillsboro*, 763 F.3d 1106, 1114 (9th Cir. 2014); *see also Lanman v. Johnson Cnty.*, 393 F.3d 1151, 1157 (10th Cir. 2004) ("Personality conflicts among coworkers (even those expressed through the use (or misuse) of mental health terminology) generally do not establish a perceived impairment on the part of the employer."); *Brunke v. Goodyear Tire & Rubber Co.*, 344 F.3d 819, 822 (8th Cir. 2003) ("[A]n employee does not establish a prima facie case of ADA 'regarded-as' disability simply because he or she was disciplined or discharged for failure to get along with co-workers or supervisors."). Indeed, this Court has held that a plaintiff "failed to present any evidence from which a rational juror could find he was regarded as having a mental impairment" when the evidence that the plaintiff pointed to showed only that coworkers "regarded him as 'paranoid,' 'disgruntled,' 'oppositional,' 'difficult to interact with,' 'unusual,' 'suspicious,' 'threatening,' and

12

'distrustful.'" *Watson v. City of Mia. Beach*, 177 F.3d 932, 935 (11th Cir. 1999). We concluded that those "characterizations of [the plaintiff's] behavior merely show[ed] he had serious personality conflicts with members of his department," which "do not rise to the level of a mental impairment." *Id.* (citing *Stewart v. Cnty of Brown*, 86 F.3d 107, 111 (7th Cir. 1996) as holding that "an excitable, emotionally imbalanced individual is not disabled under the ADA").

Nonetheless, even assuming that Forsyth has established a prima facie case for discrimination, his claim still fails at the next step of the *McDonnell–Douglas* analysis: the University presented a legitimate, nondiscriminatory reason for firing him. The burden to show a legitimate, nondiscriminatory reason is "exceedingly light." *Perryman v. Johnson Prods. Co., Inc.*, 698 F.2d 1138, 1142 (11th Cir. 1983). Indeed, "[t]he defendant need not persuade the court that it was actually motivated by the proffered reasons." *Tex. Dep't of Cmty. Affs. v. Burdine*, 450 U.S. 248, 254 (1981). The burden is "merely one of production." *Chapman v. AI Transp.*, 229 F.3d 1012, 1024 (11th Cir. 2000). The employer "must clearly set forth, through the introduction of admissible evidence," *Burdine*, 450 U.S. at 255, a reason unrelated to disability "that might motivate a reasonable employer" to fire an employee, *Chapman*, 229 F.3d at 1030. Then, "our inquiry is limited to whether the employer gave an honest explanation of its behavior." *Elrod v. Sears, Roebuck & Co.*, 939 F.2d 1466, 1470 (11th Cir. 1991); *see also Smith v. Papp Clinic, P.A.*, 808 F.2d

13

1449, 1452–53 (11th Cir. 1987) (finding no violation because "the employer fired an employee because it honestly believed that the employee had violated a company policy, even if it was mistaken in such belief").

Here, the University says that it fired Forsyth because he took unauthorized breaks in a makeshift breakroom and lied about it. The University has offered substantial admissible evidence supporting that reason, and a reasonable employer might be motivated to fire an employee for that reason. Because the University presented a legitimate, nondiscriminatory reason for firing Forsyth, his disparate treatment claim fails unless he can show that the proffered reason is pretext. He has not done so.

A reason is pretextual only if "it is shown *both* that the reason was false, *and* that discrimination was the real reason." *Brooks v. Cnty. Comm'n of Jefferson Cnty.*, 446 F.3d 1160, 1163 (11th Cir. 2006). A plaintiff "must present actual evidence to satisfy this burden because '[c]onclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext.'" *Ctr.*, 895 F.3d at 1303. Importantly, "we must respect that an 'employer [need not] have good cause for its decisions.'" *Jefferson v. Sewon Am., Inc.*, 891 F.3d 911, 924 (11th Cir. 2018). Instead, an employer "may fire an employee for a good reason, a bad reason, a reason based on erroneous facts, or for no reason at all, as long as its action is not for [an unlawful] reason." *Id*. In other words, we need not "determine that the employer was

14

correct in its assessment of the employee's performance; [we] need only determine that the defendant in good faith *believed* plaintiff's performance to be unsatisfactory" because then the asserted reason could not be "mere pretext for discrimination." *Moore v. Sears, Roebuck & Co.*, 683 F.2d 1321, 1323 n.4 (11th Cir. 1982) (emphasis added).

Forsyth has shown neither that the University's reason was false nor that discrimination was its real motivation. Nothing in the record indicates that the University did not believe that Forsyth was taking unauthorized breaks when it fired him. Even though the Department of Labor Board of Appeals ultimately concluded that his unauthorized breaks may have been justified, the contemporaneous notes and emails among Forsyth's supervisors confirm that they believed he and the other two employees caught going into and out of the makeshift breakroom were taking unauthorized breaks and violating the University's policies. And nothing in the record even hints that Forsyth did not lie about having a key to this room, which might, by itself, motivate a reasonable employer to fire him.

Nor does the record support a finding that the University's real reason for firing Forsyth was discrimination. In fact, the record belies such a finding. Here, all of the employees who had a key to the makeshift breakroom and who were seen going into the room on the video (including Forsyth) were fired for the incident. That is true even though one of these employees had previously received only one verbal

15

counseling—not even significant enough to make it into his personnel file—in six years. Because Forsyth has not provided "actual evidence" that the University's reason was pretext, even if he had established a prima facie case, his disparate treatment discrimination claim fails.

## B. Disparate Impact

Forsyth's disparate impact discrimination claim fares no better. "[D]isparate-impact claims 'involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity.'" *Raytheon Co. v. Hernandez*, 540 U.S. 44, 52 (2003). Importantly, disparate impact claims do not require a showing of discriminatory intent. *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1278 (11th Cir. 2000).

The parties disagree over whether disparate impact claims can be brought under the Rehabilitation Act. We have never directly addressed the issue, *see Berg v. Fla. Dep't of Labor & Emp. Sec., Div. of Vocational Rehab.*, 163 F.3d 1251, 1254 (11th Cir. 1998), and we need not do so here. Even assuming that disparate impact claims are cognizable under the Rehabilitation Act, Forsyth has not adequately pleaded one here. To bring a disparate impact claim, a plaintiff must "identif[y] a[] specific test, requirement, or practice … that has an adverse impact on [protected] workers." *Smith v. City of Jackson*, 544 U.S. 228, 241 (2005). It is not enough to

16

"point to a generalized policy that leads to such an impact." *Id.* Instead, "the employee is 'responsible for isolating and identifying the *specific* employment practices that are allegedly responsible for any observed statistical disparities.'" *Id.* (citation omitted). For example, in *Smith*, the Supreme Court rejected a claim that a pay plan was discriminatory when all that was shown was that older workers were paid relatively less than younger workers because the plaintiffs had not pointed to anything specific within the pay plan that adversely affected them. *Id.*

After isolating the specific, complained-of policy or practice, the plaintiff must then establish its differential impact. "Typically, a disparate impact is demonstrated by statistics." *Hallmark Devs., Inc. v. Fulton Cnty.*, 466 F.3d 1276, 1286 (11th Cir. 2006). But when assessing disparate impact claims related to disability, it may not be necessary to provide statistical data. *See* EEOC Tech. Assistance Manual § iv.3. *But cf. Schwarz v. City of Treasure Island*, 544 F.3d 1201, 1217 (11th Cir. 2008) (citations omitted). But even if statistical evidence is not necessary, the plaintiff must somehow show that the policy or practice at issue had a significantly greater negative impact on people with a certain disability than it did on people without that disability. *Id.* at 1217–18. Importantly, "it's not enough to show that a few people are affected by a policy—rather, the disparity must be

substantial enough to raise an inference of causation." *Schaw v. Habitat for Human.*, 938 F.3d 1259, 1274 (11th Cir. 2019).

Here, Forsyth has not met this standard by allegation or evidence. Forsyth says that the University "utilized an evaluation and disciplinary system which assessed [him] not on how he performed his duties but on his mental state and condition." But he provides no more detail. Importantly, he points to no specific aspect of the "evaluation and disciplinary system" that creates a disparate impact. He has also "presented *no* comparative data at all." *See Schwarz*, 544 F.3d at 1218. He argues that the system "had a disparate impact on individuals who suffer from mental impairments, such as depression and anxiety." But he has not alleged, much less shown, that any other employee even had a mental impairment, much less that he or she was negatively impacted by the University's "evaluation and disciplinary system" in a way that employees without mental impairments were not. Accordingly, Forsyth's disparate impact claim fails.

## IV.   CONCLUSION

The district court correctly granted summary judgment to the University on both Forsyth's disparate treatment and disparate impact claims. Accordingly, we **AFFIRM.**